

**FILE**

IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON
DATE FEB 27 2014

~~CHIEF JUSTICE~~

This opinion was filed for record
at 8:00 a.m. on Feb. 27 2014

Ronald R. Carpenter
Supreme Court Clerk

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| Respondent, | ) | No. 87663-1 |
| | ) | |
| v. | ) | En Banc |
| | ) | |
| SHAWN DANIEL HINTON, | ) | |
| | ) | |
| Appellant. | ) | Filed  **FEB 2 7 2014** |
| | ) | |

GONZÁLEZ, J.—We consider whether a text message conversation was "a private affair[ ]" protected from a warrantless search by article I, section 7 of our state constitution. A police detective read text messages on a cell phone police seized from Daniel Lee, who had been arrested for possession of heroin. Among other things, the detective read an incoming text message from Shawn Hinton, responded to it posing as Lee, and arranged a drug deal. Hinton was consequently arrested and charged with attempted possession of heroin. Hinton contends that the detective's conduct violated his rights under article I, section 7 and the Fourth Amendment.

We agree that Hinton's text message conversation was a private affair protected by the state constitution from warrantless intrusion. We reverse both the Court of Appeals' decision and Hinton's conviction.

BACKGROUND

City of Longview police arrested Lee for possession of heroin and seized his iPhone. The iPhone, which continually received calls and messages at the police station, was handed over to Detective Kevin Sawyer when he started his shift that evening. Detective Sawyer looked through the iPhone for about 5 or 10 minutes and saw a text message from a contact identified as "Z–Jon." Detective Sawyer recognized that Z-Jon was using drug terminology, and through a series of exchanged messages, Detective Sawyer arranged a meeting with Z-Jon to sell him heroin. When Jonathan Roden arrived for the transaction, he was arrested.[1]

Detective Sawyer booked Roden into jail and heard the iPhone signal receipt of a new text message. Detective Sawyer read the text message from "Z-Shawn Hinton," which read, "'Hey, what's up dog? Can you call me? I need to talk to you.'" Verbatim Report of Proceedings (Apr. 29, 2010) at 22, 13. Sawyer again posed as Lee, responded to the message, arranged another drug transaction, and arrested Hinton when he arrived at the meeting location.

---

[1] Roden claims in a separate case before this court that the detective's actions violated Washington's privacy act. *State v. Roden*, No. 87669-0 (Wash. Feb. 27, 2014).

Hinton was charged with attempted possession of heroin. He moved to suppress the evidence obtained from the iPhone, arguing that the detective's conduct violated article I, section 7 of the Washington State Constitution, the Fourth Amendment to the United States Constitution, and the Washington privacy act. The trial court denied the suppression motion and found Hinton guilty on stipulated facts. Hinton appealed and argued the constitutional issues. The Court of Appeals affirmed. *State v. Hinton*, 169 Wn. App. 28, 280 P.3d 476 (2012). We granted Hinton's petition for review to decide whether the detective's conduct violated the state or federal constitutions. *State v. Hinton*, 175 Wn.2d 1022, 291 P.3d 253 (2012).

STANDARD OF REVIEW

This Court reviews a trial court's legal conclusions on a motion to suppress de novo. *State v. Schultz*, 170 Wn.2d 746, 753, 28 P.3d 484 (2011) (citing *State v. Smith*,165 Wn.2d 511, 516, 199 P.3d 386 (2009)).

ANALYSIS

Whether individuals have an expectation of privacy in the content of their text messages under state law is an issue of first impression in Washington. Similarly, whether federal law protects the content of text messages has not been settled in federal courts. In *City of Ontario v. Quon*, 560 U.S. 746, 130 S. Ct. 2619, 177 L. Ed. 2d 216 (2010), the United States Supreme Court assumed, without deciding, that citizens do have a reasonable expectation of privacy in their text messages, but upheld a police department's review of an officer's text messages as reasonable under the

Fourth Amendment. Several lower courts have held that people have an expectation of privacy under the Fourth Amendment in the content stored on their cell phones, including text messages. *See United States v. Zavala*, 541 F.3d 562, 577 (5th Cir. 2008); *United States v. Finley*, 477 F.3d 250, 259 (5th Cir. 2007); *United States v. Davis*, 787 F. Supp. 2d 1165, 1170 (D. Or. 2011); *United States v. Quintana*, 594 F. Supp. 2d 1291, 1299 (M.D. Fla. 2009). Other courts have found a privacy interest in text messages stored by a service provider. *See Missouri v. Clampitt*, 364 S.W.3d 605, 611 (Mo. Ct. App. 2012); *State v. Bone*, 12-34 (La. App. 5 Cir. 09/11/12); 107 So. 3d 49, 63-67. Fewer courts have addressed the privacy interests of a sender when police access a sender's text messages on a recipient's device. *Compare State v. Patino*, No. P1-10-1155A, slip op. (R.I. Super. Ct. Sept. 4, 2012) (finding sender had reasonable expectation of privacy in sent text messages accessed by police during search of recipient's cell phone), *with Fetsch v. City of Roseburg*, 2012 WL 6742665 (D. Or. Dec. 31, 2012) (finding sender had no reasonable expectation of privacy in text messages once sent to a third party). We do not reach the Fourth Amendment inquiry as we resolve this case under our state constitution, which "'clearly recognizes an individual's right to privacy with no express limitations'." *State v. Young*, 123 Wn.2d 173, 180, 867 P.2d 593 (1994) (quoting *State v. Simpson*, 95 Wn.2d 170, 178, 622 P.2d 1199 (1980)).

When presented with arguments under both the state and federal constitutions, we start with the state constitution. *State v. Athan*, 160 Wn.2d 354, 365, 158 P.3d 27

(2007) (citing *State v. Carter*, 151 Wn.2d 118, 125, 85 P.3d 887 (2004)). It is well established that article I, section 7 is qualitatively different from the Fourth Amendment and provides greater protections. *Id.*; *State v. O'Neill*, 148 Wn.2d 564, 584, 62 P.3d 489 (2003); *State v. Jackson*, 150 Wn.2d 251, 259, 76 P.3d 217 (2003); *see also State v. Gunwall*, 106 Wn.2d 54, 720 P.2d 808 (1986). Article I, section 7 "is grounded in a broad right to privacy" and protects citizens from governmental intrusion into their private affairs without the authority of law. *State v. Chacon Arreola*, 176 Wn.2d 284, 291, 290 P.3d 983 (2012) (citing *State v. Buelna Valdez*, 167 Wn.2d 761, 772, 224 P.3d 751 (2009)).

The private affairs inquiry is broader than the Fourth Amendment's reasonable expectation of privacy inquiry. *Young*, 123 Wn.2d at 181. Under the Fourth Amendment, a search occurs if the government intrudes upon a subjective and reasonable expectation of privacy. *Katz v. United States*, 389 U.S. 347, 351-52, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967). Under article I, section 7 a search occurs when the government disturbs "those privacy interests which citizens of this state *have held, and should be entitled to hold*, safe from governmental trespass absent a warrant." *State v. Myrick*, 102 Wn.2d 506, 511, 688 P.2d 151 (1984) (emphasis added). The "authority of law" required by article I, section 7 is a valid warrant unless the State shows that a search or seizure falls within one of the jealously guarded and carefully drawn exceptions to the warrant requirement. *State v. Miles*, 160 Wn.2d 236, 244, 156 P.3d 864 (2007); *State v. Rife*, 133 Wn.2d 140, 150-51, 943 P.2d 266 (1997).

5

Here, the State does not argue that there was an exception but rather that the text message communications were not "private affairs" under our constitution.

To determine whether governmental conduct intrudes on a private affair, we look at the "nature and extent of the information which may be obtained as a result of the government conduct" and at the historical treatment of the interest asserted. *Miles*, 160 Wn.2d at 244 (citing *State v. McKinney*, 148 Wn.2d 20, 29, 60 P.3d 46 (2002)); *see also, e.g.*, *State v. Jorden*, 160 Wn.2d 121, 156 P.3d 893 (2007) (finding random, suspicionless searches of a motel guest registry unconstitutional because those searches may provide "'intimate details about a person's activities and associations'" (quoting *McKinney*, 148 Wn.2d at 30 n.2); *McKinney*, 148 Wn.2d at 30 (finding no privacy interest in department of licensing records because they do not "reveal intimate details of the defendants' lives, their activities, or the identity of their friends or political and business associates").[2]

Viewing the contents of people's text messages exposes a "wealth of detail about [a person's] familial, political, professional, religious, and sexual associations." *United States v. Jones*, ___ U.S. ___, 132 S. Ct. 945, 955, 181 L. Ed. 2d 911 (2012) (Sotomayor, J., concurring) (discussing GPS (global positioning system) monitoring).

---

[2] Generally, article I, section 7 rights may be enforced by exclusion of evidence only at the instance of one whose own privacy rights were infringed by government action. *See State v. Goucher*, 124 Wn.2d 778, 788, 881 P.2d 210 (1994). Our analysis therefore begins with the question of whether the State disturbed Hinton's private affairs. *See, e.g., Jorden*, 160 Wn.2d at 125-27. In this case, that standing analysis basically duplicates the substantive article I, section 7 analysis discussed below. Simply put, Hinton had standing to challenge the search of Lee's phone if the search disturbed a privacy interest he had in his text messages to Lee.

Text messages can encompass the same intimate subjects as phone calls, sealed letters, and other traditional forms of communication that have historically been strongly protected under Washington law. Although text message technology rendered Hinton's communication to Lee more vulnerable to invasion, technological advancements do not extinguish privacy interests that Washington citizens are entitled to hold. The right to privacy under the state constitution is not confined to "a 'protected places' analysis," or "to the subjective privacy expectations of modern citizens who, due to well publicized advances in surveillance technology, are learning to expect diminished privacy in many aspects of their lives." *Myrick*, 102 Wn.2d at 513, 511. We find that the officer's conduct invaded Hinton's private affairs and was not justified by any authority of law offered by the State.

The Court of Appeals relied on *State v. Wojtyna*, 70 Wn. App. 689, 855 P.2d 315 (1993), where the court held that Wojtyna's phone number, displayed on a pager, was not a private affair protected under the state constitution. The court recognized that telephonic and electronic communications are strongly protected under Washington law, but found that situation different because "*all* that was learned from the pager was the telephone number of one party, the party dialing." *Id.* at 695 (emphasis added). In contrast, the nature and extent of information exchanged during a text messaging conversation can involve the same intimate details shared during personal phone calls. Sophisticated text messaging technology enables "[l]ayered interpersonal communication[s]" that reveal "intimate . . . thoughts and emotions to

7

those who are expected to guard them from publication." *Patino*, slip op. at 83, 70.

Text messaging is an increasingly common mode of personal communication. Br. of

Amicus Curiae Elec. Frontier Found. at 6 (noting statistic that users who text sent or

received an average of 41.5 messages per day (citing AARON SMITH, PEW RESEARCH

CTR., AMERICANS AND TEXT MESSAGING (Sept. 19, 2011), *available at*

http://www.pewinternet.org/2011/09/19/americans-and-text-messaging/)). Text

message use is expected to rise given that 95 percent of young adults, ages 18-29, use

text messaging. SMITH, *supra*, at 3.

Many courts, in finding a legitimate expectation of privacy in the contents of

one's cell phone, have recognized the private nature of text messages. *See Zavala*,

541 F.3d at 577 (finding that "cell phones contain a wealth of private information,

including . . . text messages"); *Finley*, 477 F.3d at 259; *Davis*, 787 F. Supp. 2d at

1170; *United States v. Gomez*, 807 F. Supp. 2d 1134, 1140 (S.D. Fla. 2011);

*Quintana*, 594 F. Supp. 2d at 1299; *State v. Smith*, 124 Ohio St. 3d 163, 169, 2009-

Ohio-6426, 920 N.E.2d 949 (2009); *cf. Quon*, 560 U.S. at 760 (noting that text

messaging communications are "so pervasive that some persons may consider them to

be essential means or necessary instruments for self-expression, even self-

identification"). Despite the fact that a cell phone is carried on a person in public, text

messages often contain sensitive personal information about an individual's

associations, activities, and movements. Moreover, individuals closely associate with

and identify themselves by their cell phone numbers, such that the possibility that

someone else will possess an individual's phone is "unreflective of contemporary cell phone usage." *Patino*, slip op. at 70.

The historical treatment of phone calls and electronic communications supports finding that text messages are private affairs. In *Gunwall*, we noted Washington's "long history of extending strong protections to telephonic and other electronic communications." 106 Wn.2d at 66. We detailed the history of statutory protection for telegrams, which was rooted in the 1881 Code, adopted before statehood. *Id.* Washington's privacy act, chapter 9.73 RCW, which prohibits anyone not operating under a court order from intercepting or recording certain private communications without the consent of all parties, is one of the most restrictive surveillance laws ever promulgated. *State v. Roden*, No. 87669-0, slip op. at 3 (Wash. Feb. 27, 2014) (citing *State v. Faford*, 128 Wn.2d 476, 481, 910 P.2d 447 (1996)). "In balancing the legitimate needs of law enforcement to obtain information in criminal investigations against the privacy interests of individuals, the Washington [privacy act], unlike similar statutes in·. . . other states, tips the balance in favor of individual privacy at the expense of law enforcement's ability to gather evidence without a warrant." *State v. Christensen*, 153 Wn.2d 186, 199, 102 P.3d 789 (2004). In fact, "[i]ntercepting or recording telephone calls violates the privacy act except under narrow circumstances, and we will generally presume that conversations between two parties are intended to be private." *State v. Modica*, 164 Wn.2d 83, 186 P.3d 1062 (2008).

Our legislature used sweeping language to protect personal conversations from intrusion. *See* RCW 9.73.030(1)(a) (protecting "[p]rivate communication transmitted by telephone, telegraph, radio, *or other device*" (emphasis added)). Based on that broad language, this court has consistently extended statutory privacy in the context of new communications technology, despite suggestions that we should reduce the protections because of the possibility of intrusion. *See Faford*, 128 Wn.2d 476 (cordless phone); *Christensen*, 153 Wn.2d 186 (same); *State v. Townsend*, 147 Wn.2d 666, 674, 57 P.3d 255 (2002) (e-mails). In *State v. Roden*, stemming from the same set of facts that gave rise to Hinton's appeal, we determined that the privacy act protected Roden's text messages from interception without consent or a court order. *Roden*, slip op. at 14. We have "repeatedly emphasized in considering constitutional privacy protections [ that] the mere possibility that intrusion on otherwise private activities is technologically feasible will not strip citizens of their privacy rights." *Faford*, 128 Wn.2d at 485 (citing *Young*, 123 Wn.2d at 186; *Myrick*, 102 Wn.2d at 513-14). Even under the Fourth Amendment, the United States Supreme Court found that an individual making a phone call in a telephone booth had a reasonable expectation of privacy even though he made the calls from a place where he could have been seen. *Katz*, 389 U.S. 347.

The Court of Appeals extended rules applied to letters directly to text messages, concluding that any privacy interest in a text message is lost when it is delivered to the recipient. *See Hinton*, 169 Wn. App. at 43 (citing *United States v.*

*King*, 55 F.3d 1193, 1195-96 (6th Cir.1995) (holding that where King voluntarily mailed letters to his wife, his expectation of privacy terminated upon delivery to her)). While text messages have much in common with phone calls and letters, they are a unique form of communication, and we will not strain to apply analogies where they do not fit. Courts have recognized that an individual maintains an expectation of privacy in sealed letters despite subjecting them to vulnerability in transit. *See Ex parte Jackson*, 96 U.S. (6 Otto) 727, 24 L. Ed. 877 (1877). But unlike letters, which are generally delivered to the home where they remain protected from intrusion, text messages are delivered to a recipient's cell phone instantaneously and remain susceptible to exposure because of a cell phone's mobility. Just as subjecting a letter to potential interception while in transit does not extinguish a sender's privacy interest in its contents, neither does subjecting a text communication to the possibility of exposure on someone else's phone. We find that Hinton retained a privacy interest in the text messages he sent, which were delivered to Lee's phone but never received by Lee.

The Court of Appeals erred by finding that Hinton lost his privacy interest in the text message communications because he sent them to a device over which he had no control. Given the realities of modern life, the mere fact that an individual shares information with another party and does not control the area from which that information is accessed does not place it outside the realm of article I, section 7's protection. In *Jorden*, 160 Wn.2d 121, we held that the practice of checking names in

a motel registry for outstanding warrants without individualized or particularized suspicion violated a defendant's privacy under article I, section 7. Because information contained in a motel registry is personal and sensitive, it is a private affair notwithstanding the fact that the area searched belongs to the motel and that an individual has no control or possessory interest in a motel's registry. *See id.* at 129-30. Similarly, notwithstanding the fact that an individual voluntarily shares financial information with his bank and can assert no property or possessory interests in the bank's files, banking records are protected by the state constitution because they "may disclose what the citizen buys [ and] what political, recreational, and religious organizations a citizen supports." *Miles*, 160 Wn.2d at 246. This court has consistently declined to require individuals to veil their affairs in secrecy and avoid sharing information in ways that have become an ordinary part of life. *See, e.g., Gunwall*, 106 Wn.2d at 67 (finding that "'[a] telephone is a necessary component of modern life'" and "'[t]he concomitant disclosure'" to the telephone company of the numbers dialed by the telephone subscriber "'does not alter the caller's expectation of privacy'" (quoting *People v. Sporleder*, 666 P.2d 135, 141 (Colo. 1983))). Hinton certainly assumed the risk that Lee would betray him to the police, but Lee did not consent to the officer's conduct. The risk that one to whom we impart private information will disclose it is a risk we "'necessarily assume whenever we speak.'" *Hoffa v. United States*, 385 U.S. 293, 303, 87 S. Ct. 408, 17 L. Ed. 2d 374 (1966) (quoting *Lopez v. United States*, 373 U.S. 427, 465, 83 S. Ct. 1381, 10 L. Ed. 2d 462

12

(1963)); *see also, e.g., State v. Corliss*, 123 Wn.2d 656, 870 P.2d 317 (1994) (holding petitioner's state constitutional privacy rights were not violated when an informant consented to allow police officers to overhear his conversations with petitioner). But that risk should not be automatically transposed into an assumed risk of intrusion by the government. *See, e.g., State v. Boland*, 115 Wn.2d 571, 581, 800 P.2d 1112 (1990) (finding that the "proper and regulated collection of garbage" is "necessary to the proper functioning of modern society" and exposure of garbage to a licensed trash collector "does not also infer an expectation of governmental intrusion").

This incidental exposure of private information in the course of everyday life is distinct from other kinds of voluntary disclosure that extinguish privacy interests under article I, section 7. A defendant who leaves a paper bag on a street corner— where it lies in plain view on premises belonging to a stranger—certainly waives his privacy interest by voluntarily exposing it to the public. *State v. Loran*, 62 Wn.2d 4, 380 P.2d 733 (1963). Likewise, where an individual voluntarily discloses information to a stranger, he cannot claim a privacy interest. *See, e.g., Goucher*, 124 Wn.2d at 784; *State v. Hastings*, 119 Wn.2d 229, 235-36, 830 P.2d 658 (1992) (finding no violation of private affairs because "the decision to allow strangers to enter was made absent coercion by the police and with full knowledge of the illegal activity occurring within"). But like an individual who places his trash on the curb for routine collection by a trash collector, or one who dials telephone numbers from his home phone, or one who shares personal information with a bank or motel, one who has a conversation

with a known associate through personal text messaging exposes some information but does not expect governmental intrusion.

We are not persuaded that Hinton voluntarily exposed the text messages in a way that extinguished his privacy interest in the conversation. We reject the State's argument that the text messages were in plain view. The observation of that which is in plain view does not constitute a search because voluntary exposure to the public extinguishes any privacy interest. *See, e.g., Loran*, 62 Wn.2d at 5. However, here only one nonincriminating message was arguably in the detective's plain view. This case does not ask whether viewing a single isolated message that appeared on the screen violated Hinton's rights, and describing the subsequent text messages as "in plain view" denies the scope and extent of the detective's intrusive conduct, which involved operating the phone and posing as Lee to send text messages back and forth with Hinton.

Cases where we upheld other police ruses do not condone the detective's conduct here. The State compares this situation to *Goucher*, 124 Wn.2d 778, where an officer answered a telephone call from Goucher during a lawful search of a residence. When Goucher asked to speak to Luis, the detective told him that Luis had gone on a run but that he (the detective) could "handl[e] business." *Id.* at 781. Because Goucher voluntarily chose to continue the conversation and "expose[ ] his desire to buy drugs to someone he did not know," we found that the communication was not private. *Id.* at 784. Amicus curiae Washington Association of Prosecuting

14

Attorneys (WAPA) cites *Athan*, 160 Wn.2d 354, where police deceived Athan by convincing him to send an envelope by mail to a fictitious law firm invented by police. Br. of Amicus Curiae WAPA at 7-8. We found that when Athan voluntarily placed the envelope in the mail, he lost any privacy interest in his saliva on the envelope flap. *Athan*, 160 Wn.2d at 387. We upheld both of these practices because the defendants in those cases voluntarily disclosed information to strangers and assumed the risk of being "'deceived as to the identity of one with whom one deals,'" a risk that is "'inherent in the conditions of human society.'" *Hoffa*, 385 U.S. at 303 (quoting *Lopez*, 373 U.S. at 465).

But here, Detective Sawyer essentially posed as Lee and sent text messages to Hinton from Lee's cell phone. Unlike a phone call, where a caller hears the recipient's voice and has the opportunity to detect deception, there was no indication that anyone other than Lee possessed the phone, and Hinton reasonably believed he was disclosing information to his known contact. The disclosure of information to a stranger, Detective Sawyer, cannot be considered voluntary like Goucher's choice to speak with someone he did not know who claimed to be "handling business" or Athan's choice to engage in business with an unknown law firm that was actually fictitious. Law enforcement is certainly permitted to use some deception, but "[e]xperience should teach us to be most on our guard to protect liberty when the Government's purposes are beneficent. . . . The greatest dangers to liberty lurk in insidious encroachment by men of zeal, well-meaning but without understanding."

15

*Chandler v. Miller*, 520 U.S. 305, 322, 117 S. Ct. 1295, 137 L. Ed. 2d 513 (1997) (quoting *Olmstead v. United States*, 277 U.S. 438, 479, 48 S. Ct. 564, 72 L. Ed. 944 (1928) (Brandeis, J., dissenting)). Forcing citizens to assume the risk that the government will confiscate and browse their associates' cell phones tips the balance too far in favor of law enforcement at the expense of the right to privacy.

CONCLUSION

The state constitution "'clearly recognizes an individuals' right to privacy with no express limitations'." *Young,* 123 Wn.2d at 180 (quoting *Simpson*, 95 Wn.2d at 178). Protecting the privacy of personal communications is essential for freedom of association and expression. *See Jones*, 132 S. Ct. at 956 (Sotomayor, J., concurring) ("Awareness that the Government may be watching chills associational and expressive freedoms."). This court noted in *Rhinehart v. Seattle Times Co.* that the right to privacy has been described as "'the most comprehensive of rights,'" protecting citizens "'in their beliefs, their thoughts, their emotions, and their sensations.'" 98 Wn.2d 226, 240, 242, 654 P.2d 673 (1982) (quoting *Olmstead*, 277 U.S. at 478 (Brandeis, J., dissenting)). The use of text messaging for raw and immediate communications about private subjects is widespread and growing. To forgo sending text messages or to limit the use of text messaging to completely inconsequential matters is not only "unpalatable, [but] untenable, and disadvantageous relative to participating within our technologically dependent culture." *Patino*, slip op. at 77.

16

We reverse the Court of Appeals and vacate the conviction without prejudice. Hinton's private affairs were disturbed by the warrantless search of Lee's cell phone. Article I, section 7 protects Washington citizens from governmental intrusion into affairs that they should be entitled to hold safe from governmental trespass, regardless of technological advancements.

_____
Gonzáles, J.

WE CONCUR:


_____     _____


_____     _____
Fairhurst, J.                          Gordon McCloud, J.

*State v. Hinton (Shawn)*
Concurrence by C. Johnson, J.

No. 87663-1

C. JOHNSON, J. (concurring)—The dissent criticizes the majority's analysis

and conclusion recognizing the defendant's standing to raise the constitutional

violation. In doing so, however, the dissent disregards our cases defining the scope

of article I, section 7. Our article I, section 7 cases not only support but compel the

majority's conclusion that a citizen's constitutional private affairs may be invaded

by a warrantless search of another's cell phone. I write separately to point out the

dissent's disregard of our article I, section 7 cases establishing the scope of a

person's private affairs.

To have standing, a defendant must demonstrate a personal privacy interest

in the place or item searched. *Minnesota v. Carter*, 525 U.S. 83, 88, 119 S. Ct. 469,

142 L. Ed. 2d 373 (1998); *State v. Carter*, 127 Wn.2d 836, 841, 904 P.2d 290

(1995). There can be no debate that Daniel Lee would have a privacy interest in his

own phone. An individual's cell phone often contains a wealth of private

information about the owner, including e-mails, text messages, call histories, and address books to name a few. *United States v. Zavala*, 541 F.3d 562, 577 (5th Cir. 2008). "Cell phone and text message communications are so pervasive that some persons may consider them to be essential means or necessary instruments for self-expression, even self-identification." *City of Ontario v. Quon*, 560 U.S. 746, 759, 130 S. Ct. 2619, 177 L. Ed. 2d 216 (2010). Thus a cell phone owner such as Lee has standing to challenge a search of his phone. But Shawn Hinton, unlike Lee, does not have a privacy interest in Lee's phone generally because it is not Hinton's e-mail, address book, calendar, or call history on Lee's phone.

The inquiry in this case, however, is narrower: we must determine whether an individual has a privacy interest in the actual text message received by and stored on another individual's cell phone. Information transmitted through text messages has the potential to implicate highly personal matters. Contrary to the dissent's conclusion, a person does not lose all privacy interest in text messages merely because they are disclosed to an intended recipient, who could potentially disclose it to others. Dissent at 8–12. Rather, as the majority correctly recognizes, while there may be a risk that the person to whom we impart private information could disclose it, we do not assume the risk that the government will conduct a

warrantless intrusion into a person's private affairs. *See* majority at 12–13. This is

a rule well established by our article I, section 7 cases.[1]

In *State v. Gunwall*, 106 Wn.2d 54, 720 P.2d 808 (1986), we established a

clear distinction in defining the scope of a person's private affairs under article I,

section 7. *Gunwall* dealt with whether a warrant was required to seize and search

telephone records from the telephone company who, for business purposes,

compiled those records. In concluding that a warrant was required, we adapted the

reasoning from other state cases:

> "A telephone subscriber . . . has an actual expectation that the
> dialing of telephone numbers from a home telephone will be free from
> governmental intrusion. . . . The concomitant disclosure to the
> telephone company, for internal business purposes, of the numbers
> dialed by the telephone subscriber does not alter the caller's
> expectation of privacy and transpose it into an assumed risk of
> disclosure to the government."

*Gunwall*, 106 Wn.2d at 67 (first alteration in original) (quoting *People v.*

*Sporleder*, 666 P.2d 135, 141 (Colo. 1983)). We concluded *Gunwall* holding that

absent a warrant, the police "unreasonably intruded into [the defendant's] private

affairs." *Gunwall*, 106 Wn.2d at 68.

---

[1] The dissent also points out that a person's private affairs do not include information voluntarily exposed to the general public. Dissent at 10 (quoting *State v. Goucher*, 124 Wn.2d 778, 784, 881 P.2d 210 (1994)). While this may be correct, it is irrelevant to this case because Hinton did not expose his information to the public generally. The question presented here is whether the police illegally accessed the text message without a warrant.

Further, in *State v. Boland*, 115 Wn.2d 571, 800 P.2d 1112 (1990), we determined the scope of an individual's private affairs with regard to garbage. We noted that while it might be unreasonable to expect that after placing a garbage can on the curb for collection "children, scavengers, or snoops will not sift through one's garbage," it is reasonable to believe the garbage we place in our trash cans will be protected from warrantless government intrusion. *Boland*, 115 Wn.2d at 578. "'People reasonably believe that police will not indiscriminately rummage through their trash bags to discover their personal effects.'" *Boland*, 115 Wn.2d at 578 (quoting *State v. Tanaka*, 67 Haw. 658, 662, 701 P.2d 1274 (1985)).

These cases, along with others defining the scope of a person's private affairs,[2] teach us that it is the determination of a constitutionally protectable interest, or private affair, that gives rise to the ability to challenge the warrantless search by the government. Thus, a telephone company or other provider or the trash collector's "possession" of the information seized does not eliminate a person's constitutional protections from government intrusion into that information.

---

[2] *See also State v. Miles*, 160 Wn.2d 236, 156 P.3d 864 (2007) (privacy interest in banking records); *State v. Jorden*, 160 Wn.2d 121, 156 P.3d 893 (2007) (privacy interest in motel registry).

4

Likewise, in transmitting his text messages to Lee, Hinton could reasonably believe Lee would receive and read those messages, but this does not lead to the belief that the government would acquire this information absent a warrant. His disclosure to Lee did not transform the scope of his private affairs into "an assumed risk of disclosure." As a result, he retained a privacy interest in the information communicated through his text message.

Further, considering the wealth of personal and private information that is potentially stored on a cell phone, we should continue to recognize a rule that does not incentivize warrantless searches of cell phones. The dissent's holding, however, would create such an incentive. If, under the dissent's reading, Hinton had no privacy interest in the text message—and thus no standing to challenge the search of the text message—the police would suffer no consequences for the warrantless search. Allowing for such a situation would diminish our constitutional private affairs recognized under article I, section 7.

The sender of a text message assumes a limited risk that the recipient may voluntarily expose that message to a third party, but under our cases, the sender does not assume the risk that the police will search the phone in a manner that violates the phone owner's rights. Article I, section 7 establishes protection against such warrantless intrusion, and the majority correctly recognizes this principle.

Contrary to the dissent's view, it is the determination that a private affair has been invaded that gives rise to the ability to challenge the search.

To illustrate, the police may seize an individual's phone pursuant to a lawful search incident to arrest to prevent the destruction of evidence, *State v. Valdez*, 167 Wn.2d 761, 776, 224 P.3d 751 (2009), but may search the phone (including text messages) only with a warrant, a valid exception to the warrant requirement, or the phone owner's express consent. In the absence of express consent from the phone owner, however, the sender of a text message should be allowed to stand in the shoes of the phone owner for purposes of challenging the search of the phone through which the text message was viewed.

In this case, there is no evidence that Lee consented to the search of his phone. Without a warrant, and without conforming to an exception to the warrant requirement, Detective Sawyer searched through Lee's phone and responded to text messages posing as Lee. Because there is no evidence Lee consented to the search, Hinton should have standing to challenge it. Likewise, because the phone was searched without a warrant, an exception, or consent, any evidence derived from the search, including Hinton's responses to Detective Sawyer's text messages and his appearance at the drug transaction, is fruit of the poisonous tree, and the conviction must be overturned.

Respectfully, I concur.

No. 87663-1

J.M. JOHNSON, J. (dissenting)—In this case, the majority goes too far,
failing to distinguish between the extent of article I, section 7 protections for
a search of one's own cell phone and a search of a cell phone owned by a third
party. I acknowledge that article I, section 7 protections are robust, extending
further than the Fourth Amendment in many contexts. Nevertheless, these
rights are personal and therefore may not be vicariously asserted. *State v.
Goucher*, 124 Wn.2d 778, 787, 881 P.2d 210 (1994) (citing *State v. Foulkes*,
63 Wn. App. 643, 647, 821 P.2d 77 (1991)). While the constitutionality of a
warrantless search of one's own cell phone is certainly in need of clarification,
it is a question for another day.

We are asked to consider only the narrow question of whether a person
has a constitutionally protected privacy right in a text message received on a
*third party's* cell phone. Because Hinton did not retain a privacy interest in
text messages he sent that were delivered to a third party's cell phone, he does

-1-

not have the requisite standing to challenge the government action in this case.

I, therefore, dissent.

FACTS AND PROCEDURAL HISTORY

A thorough recitation of the facts and procedural history is necessary to illustrate precisely what is—and is not—before this court. When Detective Kevin Sawyer arrived for his shift on November 3, 2009, he came into possession of Daniel Lee's iPhone.[1] Lee had been arrested on drug charges and the phone had been ringing frequently. Verbatim Report of Proceedings (VRP) (Apr. 29, 2010) at 4-5. The record does not indicate the circumstances under which the cell phone was seized. At the suppression hearing, Detective Sawyer testified about the functionality of an iPhone. Specifically, he noted that if an iPhone is turned on, a shortened version of any text message received appears directly on the screen. A person does not need to manipulate the phone or push any buttons to read such a text message. *Id.* at 6-7.

The cell phone was sitting on the passenger seat of Detective Sawyer's vehicle when he heard a tone indicating that a new message had been received. *Id.* at 22. He did not have to push any buttons or access the cell phone to read the message. The text message simply appeared on the iPhone screen. *Id.* at

---

[1] Daniel Lee is not a party to this action.

-2-

13. Detective Sawyer picked up the cell phone to examine it and saw a text message from someone listed as "Z-Shawn Hinton." *Id.* at 22. This message read, "'Hey, what's up dog? Can you call me? I need to talk to you.'" *Id.* Detective Sawyer responded, "'Can't now. What's up?'" *Id.* The iPhone then indicated a response from "Z-Shawn Hinton," which read, "'I need to talk to you about business. Please call when you get a chance.'" *Id.* at 23-24. Detective Sawyer then wrote back, "'I'm about to drop off my last.'" *Id.* at 24. Hinton responded, "'Please save me a ball. Please? I need it. I'm sick.'"[2] *Id.* at 25. They set up a purported transaction for the purchase of heroin. When the two met, Hinton was placed under arrest. *Id.* at 15. Detective Sawyer called the phone number listed in Lee's iPhone as "Z-Shawn Hinton" and a cell phone on Hinton's person rang in response. *Id.* at 23-26.

By information, the Cowlitz County prosecutor charged Hinton with one count of attempted possession of heroin. Clerk's Papers (CP) at 1. Hinton then filed a motion to suppress. The court concluded that Hinton did not have automatic or general standing to contest the search of Lee's iPhone. VRP (Apr. 29, 2010) at 61. The court further held that he did not have a privacy

---

[2] A "ball" is a drug weight. It is about 3.54 grams. VRP (Apr. 29, 2010) at 10. "Sick" is a drug term for when a user is coming off a high and looking to obtain more drugs. *Id.* at 8.

-3-

interest in the text messages sent to Lee. *Id.* at 63. The motion to suppress was accordingly denied. *Id.*

Following entry of findings of fact and conclusions of law, Hinton stipulated to facts sufficient to convict and was found guilty. CP at 34-36. He was then sentenced within the standard range and filed a timely notice of appeal. CP at 38-49, 50. Division Two of the Court of Appeals held that neither article I, section 7 of the Washington State Constitution nor the Fourth Amendment to the United States Constitution protects Hinton's text messages on the recipient's cell phone. The court accordingly affirmed the superior court's ruling denying Hinton's motion to suppress. *State v. Hinton*, 169 Wn. App. 28, 45, 280 P.3d 476 (2012). Hinton then filed a petition for review, which was granted. *State v. Hinton*, 175 Wn.2d 1022, 291 P.3d 253 (2012).

ANALYSIS

This is not the first time that this court has failed to acknowledge that article I, section 7 rights are nontransferable. In *State v. Ibarra-Cisneros*, 172 Wn.2d 880, 885-86, 263 P.3d 591 (2011), this court reversed the petitioner's conviction for possession of cocaine based on the unlawful search of his brother's home. The petitioner called his brother's cell phone after his brother had been arrested and the cell phone was answered by a drug enforcement

administration agent who was working with the police. The agent told Ibarra-Cisneros that his brother was in the bathroom. The two had a heated verbal exchange and agreed to meet in person. After Ibarra-Cisneros got out of his vehicle and stood beside it, officers found a freshly dropped bindle of cocaine on the ground where he had been standing. *Id.* at 882. This court chose to avoid the standing issue, instead holding that the Court of Appeals erred by relying on the attenuation doctrine. *Id.* at 885. The court's decision to avoid the standing issue granted Ibarra-Cisneros the benefit of constitutional protection that should have been reserved for his brother—the owner of the cell phone. *See id.* at 896 (Madsen, C.J., dissenting).

Chief Justice Madsen's dissent in *Ibarra-Cisneros* is on point:

> Under a fundamental constitutional analysis, there must be a protectable privacy interest at stake before there can possibly be any constitutional violation or any need to address taint or suppression of evidence. When, as in this case, a record unequivocally shows that no such interest exists, a court should not conclude that evidence must be suppressed as the only fair thing to do. There is nothing unfair about declining to suppress evidence when no privacy interest has been at stake and consequently none has been violated.

*Id.* at 888-89.

Chief Justice Madsen ultimately concluded that "Ibarra-Cisneros had no protected privacy interest in his brother's cell phone or in any information

stored on it." *Id.* at 890 (Madsen, C.J., dissenting). I agree with the Chief Justice's analysis in that case and find it applicable to the case at hand. Here, as in *Ibarra-Cisneros*, it is improper for the court to gloss over the standing doctrine, effectively extending privacy protection to those other than the owner of the cell phone, far beyond article I, section 7's intended scope.

In this case, Hinton does not have standing to contest the search of Lee's cell phone that ultimately led to his arrest. Fourth Amendment and article I, section 7 rights are personal and therefore may not be vicariously asserted. *Goucher*, 124 Wn.2d at 787 (citing *Foulkes*, 63 Wn. App. at 647).

We recognize two different types of standing in the search and seizure context. Under general standing rules:

> A defendant may challenge a search or seizure only if he or she has a personal Fourth Amendment privacy interest in the area searched or the property seized. The defendant must personally claim a justifiable, reasonable, or legitimate expectation of privacy that has been invaded by governmental action.

*Id.* (citations omitted).

A defendant has automatic standing to contest a search or seizure of contraband under article I, section 7 if (1) the charged offense involves possession of contraband as an essential element of the offense and (2) the defendant was in possession of the contraband at the time of the contested

search or seizure. *Id.* at 787-88 (citing *State v. Zakel*, 119 Wn.2d 563, 568, 834 P.2d 1046 (1992)); *see also State v. Simpson*, 95 Wn.2d 170, 175-79, 622 P.2d 1199 (1980) (lead opinion) (affirming automatic standing under article I, section 7 of the Washington Constitution, notwithstanding the United States Supreme Court's decision to abolish the automatic standing rule under the Fourth Amendment in *United States v. Salvucci*, 448 U.S. 83, 85, 100 S. Ct. 2547, 65 L. Ed. 2d 619 (1980)); *accord State v. Williams*, 142 Wn.2d 17, 22-23, 11 P.3d 714 (2000). The automatic standing doctrine is inapplicable here because the search at issue does not involve Hinton's possession of contraband.

I agree with the majority's characterization that the standing analysis and substantive article I, section 7 analyses are somewhat duplicative:

> Generally, article I, section 7 rights may be enforced by exclusion of evidence only at the instance of one whose own privacy rights were infringed by government action. Our analysis therefore begins with the question of whether the State disturbed Hinton's private affairs. In this case, that standing analysis basically duplicates the substantive article I, section 7 analysis . . . . Simply put, Hinton had standing to challenge the search of Lee's phone if the search disturbed a privacy interest he had in his text message to Lee.

Majority at 6 n.2 (citations omitted).

-7-

I would hold that because the alleged search of Lee's cell phone did not disturb a privacy interest Hinton had in the text messages he sent to Lee, he does not have standing to challenge the government action. I would accordingly affirm the Court of Appeals.

A.    Automatic Standing

Hinton does not have automatic standing because he was not in possession of contraband at the time that the search took place. Furthermore, Lee's cell phone was not the contraband for which he was ultimately convicted. Thus, we must consider whether he has a "justifiable, reasonable, or legitimate expectation of privacy" in the area searched or the property seized. *Goucher*, 124 Wn.2d at 787.

B.    General Standing

In deciding whether a particular conversation is private, we consider the subjective intentions of the parties to the conversation, as well as their reasonable expectations. *State v. Clark*, 129 Wn.2d 211, 225, 916 P.2d 384 (1996). "A communication is not private where anyone may turn out to be the recipient of the information or the recipient may disclose the information." *Id.* at 227 (citing *State v. Wojtyna*, 70 Wn. App. 689, 695-96, 855 P.2d 315 (1993)). "'[T]he Court consistently has held that a person has no legitimate

expectation of privacy in information he voluntarily turns over to third parties.'" *Wojtyna*, 70 Wn. App. at 694 (internal quotation marks omitted) (quoting *United States v. Meriwether*, 917 F.2d 955, 959 (6th Cir. 1990)).

Although the scope of article I, section 7 protections for text messages is an issue of first impression, this court has considered several cases that are similar and should guide our analysis in this case. In *Goucher*, detectives searched a third party's residence pursuant to a search warrant. During the search, the telephone rang and was answered by a task force detective. An adult male asked for Luis, and the detective told him that Luis had gone for a run and that he was handling business until Luis returned. 124 Wn.2d at 780-81. The caller identified himself and asked if he could come over to buy "'an eighth,'" which the detective understood to mean an eighth of an ounce of cocaine. *Id.* at 781. The two set up a purported drug transaction, and the defendant was arrested when he showed up. *Id.* The defendant was charged with one count of possessing cocaine. He filed a motion to suppress the evidence obtained as a result of the detective answering the telephone, which was denied. *Id.* His appeal was certified to this court and we considered whether the defendant's rights were violated under article I, section 7 when

the detective answered the third party's telephone and engaged him in conversation. *Id.* at 783.

We held that the defendant did not have the requisite standing to challenge the scope of the third-party search. *Id.* at 789. We noted that "'what is voluntarily exposed to the general public' is not considered part of a person's private affairs." *Id.* at 784 (quoting *State v. Young*, 123 Wn.2d 173, 182, 867 P.2d 593 (1994)).

As in *Goucher*, Hinton does not have standing to contest the search of Lee's cell phone. To assert general standing, he must "personally claim a justifiable, reasonable, or legitimate expectation of privacy that has been invaded by governmental action." *Id.* at 787. Hinton did not have a reasonable expectation of privacy in Lee's cell phone. He had neither possession nor control of the cell phone, and he did not have the right to exclude others from using it. Furthermore, once the text message was delivered to the cell phone, Hinton had no control over who viewed it. Given its functionality, a stranger could view the message simply by glancing at the cell phone. Alternatively, the cell phone could have been in the possession of someone other than Lee, or Lee could have simply shared the contents of the

message with others. Hinton assumed the risk that, once sent, the message would no longer be kept private.

*Wojtyna*, 70 Wn. App. 689, a Court of Appeals, Division One case, is also persuasive in this context. It has been favorably cited by this court in several cases. *See State v. Luther*, 157 Wn.2d 63, 80, 134 P.3d 205 (2006); *State v. Townsend*, 147 Wn.2d 666, 682-83, 57 P.3d 255 (2002); *Goucher*, 124 Wn.2d at 786. In *Wojtyna*, 70 Wn. App. at 691, police seized a pager pursuant to the arrest of a cocaine dealer. Incoming calls were monitored over the next six days. A detective called a number that was sent to the pager and arranged a purported drug deal with Wojtyna. Wojtyna was then arrested and charged with attempted possession of a controlled substance. *Id.* He challenged the denial of his motion to suppress. Evaluating the case on Fourth Amendment grounds, the Court of Appeals held that monitoring the defendant's incoming number on a pager was not an illegal search. *Id.* at 694-95.

The court in *Wojtyna* noted that transmissions to pagers are less private than phone conversations. The same logic can be applied to text messages. The court reasoned:

> When one transmits a message to a pager, he runs the risk that the message will be received by whomever is in possession of

the pager. Unlike the phone conversation where a caller can hear a voice and decide whether to converse, one who sends a message to a pager has no external indicia that the message actually is received by the intended recipient. Accordingly, when a person sends a message to a pager, he runs the risk that either the owner or someone in possession of the pager will disclose the contents of his message. Since the actual confidentiality of a message to a pager is quite uncertain, we decline to protect appellant's misplaced trust that the message actually would reach the intended recipient.

*Id.* at 694 (quoting *Meriwether*, 917 F.2d at 959).

In choosing to communicate via text message, Hinton assumed the risk that another party with control over the cell phone would respond to the text message. This is an assumption of risk commensurate with choosing to communicate with a stranger by phone and assuming that the stranger is in fact who he says he is.

Notably, the mere fact that the communication at issue arose from a police ruse does not suggest that Hinton's rights were violated. In *State v. Athan*, 160 Wn.2d 354, 363, 158 P.3d 27 (2007), police used a ruse to cause Athan to send an envelope by mail to what Athan believed was a law firm but was actually the police. His DNA (deoxyribonucleic acid) was found on the envelope flap. We held that Athan lost any privacy interest he may have had in his saliva when he voluntarily placed the letter in the mail. Once he sent the letter, what was done with it was out of his control. *Id.* at 367-68.

-12-

Furthermore, we noted that "[p]ublic policy allows for a limited amount of deceitful police conduct in order to detect and eliminate criminal activity." *Id.* at 377.

Like Athan, Hinton lost his privacy protection when he voluntarily sent a text message to a third party's cell phone. The fact that a police ruse encouraged him to send the messages does not change the result.

CONCLUSION

True, technological advances, particularly those that have become pervasive in everyday life, pose challenges in the article I, section 7 arena. Cases such as this one provide the temptation to overhaul our present jurisprudence for a wide variety of contexts not presently before us. Nevertheless, I am convinced that we should handle these technological search cases incrementally, as often as possible analogizing to existing article I, section 7 precedent. This approach has been advocated by Judge Posner of the Seventh Circuit, noting in dicta that courts may not need to adopt wholly distinct tests for electronic property:

> It's not even clear that we need a rule of law specific to cell phones or other computers. If police are entitled to open a pocket diary to copy the owner's address, they should be entitled to turn on a cell phone to learn its number. If allowed to leaf through a pocket address book, . . . they should be entitled to read the address book in a cell phone.

-13-

*United States v. Flores-Lopez*, 670 F.3d 803, 807 (7th Cir. 2012). I agree wholeheartedly with this approach.

It is unwise to make sweeping changes to existing law based on hypothetical facts not currently before this court. This is the precise wisdom that underlies our standing doctrine.

Here, the majority errs by acting as though a search of a text message viewed on a third party's cell phone is identical to a search of one's own cell phone. The majority's approach is inconsistent with this court's article I, section 7 jurisprudence and ignores precedent established in cases such as *Goucher*.

When Detective Sawyer viewed Hinton's text message on Lee's cell phone and responded to it, it was not a disturbance of Hinton's private affairs. *See State v. Valdez,* 167 Wn.2d 761, 772, 224 P.3d 751 (2009). Hinton simply does not have standing to contest the government action because he does not have a "justifiable, reasonable, or legitimate expectation of privacy" in information viewable on a third party's cell phone. *Goucher*, 124 Wn.2d at 787. For this reason, I dissent.

Owens, J.

Wiggins, J.

Madsen, C.J.