# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| THE STATE OF WASHINGTON,<br><br>　　　　　　　Respondent,<br><br>　　　v.<br><br>REECE WILLIAM BOWMAN,<br><br>　　　　　　　Appellant. | No. 79023-4-I<br><br>DIVISION ONE<br><br>PUBLISHED OPINION |

APPELWICK, J. — A Department of Homeland Security agent sent a series of text messages from a department phone to Bowman. He claimed to be a person to whom Bowman had sold methamphetamine earlier that day, and indicated he wanted to buy more drugs. The ruse led to charges of possession of methamphetamine with intent to deliver. Bowman claims that the ruse violated his right to privacy. He claims the trial court erred in denying his motion to suppress the drugs and drug paraphernalia on his person and in his vehicle. We agree. We reverse and remand for a new trial consistent with this opinion.

## FACTS

On February 21, 2017, Reece Bowman received text messages from an unfamiliar number claiming to be an associate of his named Mike Schabell and asking to buy drugs. Unbeknownst to Bowman, the individual sending the text messages was Department of Homeland Security Supervisory Agent Marco Dkane.

Citations and pin cites are based on the Westlaw online version of the cited material.

A month earlier, Schabell had been arrested and offered an opportunity to cooperate with law enforcement. Law enforcement wanted to know who his drug suppliers were. Schabell identified Bowman as one of his suppliers. When he was arrested again on February 21, he gave law enforcement permission to search his cell phone. Law enforcement looked through his text messages and discovered a conversation with Bowman, from which they learned Bowman's cell phone number and that Bowman had sold Schabell methamphetamine earlier that day.

Dkane texted Bowman from his undercover phone. They had the following exchange:

> [Dkane:] Hey Reese, it's [M]ike. I got a burner [phone] [be]cause my old school phone went to shit.
>
> [Dkane:] You avail[able]?
>
> [Dkane:] ?
>
> [Bowman:] Yes.
>
> [Dkane:] Got cash [redacted]
>
> [Dkane:] I could meet you in Ballard?
>
> [Dkane:] ? Lemme know please[.]
>
> [Bowman:] Yeah what Mike is this[?]
>
> [Dkane:] Schabell. Dude from today.
>
> [Dkane:] Serious?
>
> [Dkane:] I just wanna know if I can get some. Lemme know please.
>
> [Dkane:] Bro, I need 300 more at least.
>
> [Dkane:] Can I meet you back at the 7-11? [redacted] I finally have a good buyer and I need help[. P]lease let me know where to meet you and I'll come wh[e]rever. How much do I have to buy [t]o get [you] to come? I have cash.

2

[Bowman:] Mike come on then.  Didn[']t realize who this was.

[Bowman:] ["thumbs up" emoji]

[Bowman:] Call me.

[Dkane:] I'm with my old lady.  Can you come meet or no?

[Dkane:] I just need to know if I should drop her off and come meet you or no.

[Bowman:] Yes[.]

[Dkane:] Where at?  Ballard?

[Bowman:] I[']m up on Queen Ann[]e

 . . . .

[Dkane:] K. I can head over there.  Where [do] you want to meet?

[Bowman:] Where [a]r[e] [yo]u at

[Dkane:] You have clear?[1]

[Dkane:] Coming from [S]nohomish

[Dkane:] I can drop her off to meet her girlfriend around [G]reen [L]ake so.

[Bowman:] Bring her too.

[Dkane:] Where do you want me to come to?

[Dkane:] And haha btw [(by the way)].

[Bowman:] 7-11 same one[.]

[Dkane:] Ok I can be there by 10.

[Dkane:] Can I get [$]500 of clear?

[Bowman:] Sure.

[Dkane:] Thanks.

---

[1] "Clear" is a common street slang term for methamphetamine.

[Dkane:] See you at 7-11.

[Dkane:] On my way.

Bowman arrived at the 7-11 in Queen Anne with his girlfriend and two year old daughter. Dkane was waiting there with an arrest team. Dkane confirmed Bowman's identity and the team arrested him.

Officers read Bowman his Miranda[2] rights. Bowman indicated he understood his rights. He did not ask for a lawyer or indicate that he wished to remain silent. During the search incident to arrest, officers found 3.5 grams of methamphetamine on his person.

Officers then asked Bowman for consent to search his vehicle, indicating that if he refused the vehicle would be impounded and his girlfriend and daughter would be removed and without transportation. Bowman agreed and signed a consent to search form. During the search, police recovered 55.2 grams of methamphetamine, digital scales, and $610 in cash from the vehicle.

Police then transported Bowman to the Seattle Police Department West Precinct. At the precinct, Dkane and Seattle Police Detective Amy Branham interviewed Bowman. Bowman admitted during the interview that he had six to seven drug customers, there were two ounces of methamphetamine in his car that belonged to him, and his girlfriend was not involved.

The State charged Bowman with violation of the Uniform Controlled Substances Act, RCW 69.50.401(1), (2)(c). Bowman moved to suppress all evidence against him. He argued that Dkane's text message conversation with

---

[2] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

him violated his privacy rights. The trial court denied that motion, finding that his privacy rights had not been violated.

A jury found Bowman guilty as charged. Bowman appeals.

DISCUSSION

Bowman argues the trial court erred in denying his motion to suppress evidence that flowed from his text message conversation with Agent Dkane. Specifically, he argues that Dkane impersonating a known contact of his through text messages violated his right to privacy under the Washington Constitution, article I, section 7.

Under article I, section 7 of the Washington Constitution, "No person shall be disturbed in his private affairs, or his home invaded, without authority of law." Interpretation of this article requires a two part analysis. State v. Miles, 160 Wn.2d 236, 243, 156 P.3d 864 (2007). First, we must determine whether the action complained of constitutes a disturbance of "private affairs." Id. at 243-44. If we determine that a valid private affair has been disturbed, we then must determine whether the intrusion is justified by "authority of law." Id. at 244. Where, as here, the trial court's findings of fact are unchallenged, they are verities on appeal. State v. Cheatam, 112 Wn. App. 778, 782, 51 P.3d 138 (2002), aff'd, 150 Wn.2d 626, 81 P.3d 830 (2003). We review whether uncontested facts constitute a violation of article I, section 7 de novo. State v. Rankin, 151 Wn.2d 689, 694, 92 P.3d 202 (2004).

Our first inquiry is whether the text message conversation constituted a private affair. "Private affairs" are those privacy interests which citizens of this

5

state have held, and should be entitled to hold, safe from government trespass without a warrant. State v. Myrick, 102 Wn.2d 506, 511, 688 P.2d 151 (1984). In State v. Hinton, 179 Wn.2d 862, 876-77, 319 P.3d 9 (2014), the principal case upon which Bowman relies, our Supreme Court found that individuals have a privacy interest in text message conversations with known contacts. There, police arrested Daniel Lee and seized his phone. Id. at 865. While the phone was in their possession, it received a text message from a contact named "Z-Shawn Hinton." Id. at 866. The text message contained drug terminology. Id. A police detective responded to the text message on Lee's phone, posing as Lee, and set up a meeting with the sender to buy drugs. Id. When the sender, Hinton, arrived, police arrested him. Id.

Our Supreme Court held that Hinton's right to privacy had been violated. Id. at 877. It held that Hinton retained a privacy interest in the conversation because he "reasonably believed" he was texting with a "known contact." Id. at 876. It differentiated text message communication from a phone call because "unlike a phone call, where a caller hears the recipient's voice and has an opportunity to detect deception, there was no indication that anyone other than Lee possessed the phone." Id.

The State argues that because Bowman responded to messages from an unfamiliar number, he "knowingly converse[d] with a stranger," and therefore had no privacy interest. It relies on State v. Goucher, 124 Wn.2d 778, 881 P.2d 210 (1994). There, police executed a search warrant on the home of Garcia-Lopez, a drug dealer known to sell drugs out of his house. 124 Wn.2d at 780. While at the

6

residence, the phone rang. Id. at 780-81. An officer answered the phone and the caller requested to speak to "Luis." Id. at 781. The officer responded that Luis had "gone on a run," but that the officer was "handling business" until he returned. Id. The caller and officer proceeded to arrange a deal to buy drugs at the home. Id. When the caller arrived, officers arrested him. Id. Our Supreme Court held that the caller's privacy rights had not been violated because he had voluntarily conversed with someone he did not know. Id. at 784, 789.

Here, Bowman did not converse with someone he knew to be a stranger. Rather, he conversed with a person who represented himself as someone that Bowman knew. This case differs from Hinton in that the unfamiliar phone number gave some indication that the other party to the conversation might be someone other than Schabell. But, Dkane affirmatively identified himself as Schabell. His explanation for the changed number was reasonable: that his previous phone had broken. He provided details that Schabell would have known. For example, posing as Schabell, Dkane sent a text message to Bowman stating that he had met him earlier in the day and that they had done business in the past. Based on these facts, Bowman reasonably believed he was texting with a known contact. Therefore, as in Hinton, Bowman had a reasonable expectation of privacy for that conversation. Dkane invaded that right of privacy.

Our next inquiry is whether Dkane operated with "'authority of law.'" Miles, 160 Wn.2d at 243 (quoting WASH. CONST., art. I, § 7). The State does not claim that Dkane had a warrant. Rather, it claims that authority came from Schabell's consent to the search of his cell phone. The State points out that this case differs

7

from Hinton, because Schabell gave police permission to "use his phone for investigatory purposes." Consent can provide authority of law required by article I, section 7 if the State can show (1) that the consent was voluntary, (2) that the person giving consent had authority to do so, and (3) that any search did not exceed the scope of the grantor's consent. State v. Monaghan, 165 Wn. App. 782, 788-89, 266 P.3d 222 (2012). Here, the State is unable to show that either elements (2) or (3) are satisfied.

First, the State has not explained why Schabell, who was not a party to the conversation between Bowman and Dkane, would have any authority to consent to the State's invasion of Bowman's privacy interest in the conversation. Hinton recognized that one in Bowman's situation risked that a contact like Schabell would betray him to police. 179 Wn.2d at 874. For example, he could do so verbally. He could do so by surrendering his phone or computer. He could do so by sharing text messages or e-mails with law enforcement. He could consent to the State listening in on or recording his phone conversation. See State v. Corliss, 67 Wn. App. 708, 713, 838 P.2d 1149 (1992) (expectation of privacy is destroyed when one party consents to the recording), aff'd, 123 Wn. 2d 656 870 P.2d 317 (1994). Schabell betrayed Bowman verbally and by surrendering the phone and text messages. But, unlike in Corliss, Schabell was not a party to the subsequent text conversation between the police and Bowman. Schabell had no privacy interest in that conversation, and had no authority to consent to invasion of the privacy interest that under Hinton was held by Bowman.

Second, the search exceeded the scope of the consent that was given. The State points out that "a private relationship loses its constitutional significance if the other person involved chooses to cooperate with police and share their secrets." It points to the following language from <u>Hinton</u>: "Hinton certainly assumed the risk that Lee would betray him to the police, <u>but Lee did not consent to the officer's conduct</u>." 179 Wn.2d at 874 (emphasis added). Schabell consented to the search of his phone. However, even if Schabell had authority to consent to Dkane impersonating him, the record does not indicate that Schabell consented to being impersonated.

Therefore, Dkane was not acting under authority of law, and violated Bowman's right of privacy. The trial court erred by failing to suppress the evidence obtained by that violation of privacy.

We reverse and remand for a new trial, with instructions to suppress evidence obtained in violation of Bowman's right to privacy.[3]

_Appelwick, J._

WE CONCUR:

---

[3] Bowman challenges two aspects of the LFOs imposed in his judgment and sentence. Should those issues arise on remand, we note that RCW 10.82.090 provides, "As of June 7, 2018, no interest shall accrue on nonrestitution legal financial obligations." And in <u>State v. Dillon</u>, we held that the supervision fees associated with his community custody are discretionary LFOs. 12 Wn. App. 2d 133, 152, 456 P.3d 1199, <u>review denied</u>, 195 Wn.2d 1022, 464 P.3d 198 (2020).