IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>               Appellant,<br><br>      v.<br><br>HAZEN GRAHAM SHOPBELL,<br><br>               Respondent. | No. 80215-1-I<br>(Consolidated<br>with No. 80216-0-I)<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

COBURN, J. — The State appeals from an order suppressing evidence of a seizure conducted by Washington Department of Fish and Wildlife (WDFW) officers. The trial court suppressed the evidence based on its determination that the State, through WDFW, violated due process by destroying more than one thousand pounds of clams it had seized.

We hold that the destroyed clams did not constitute material exculpatory evidence and were only potentially useful to the defense. The State's destruction of evidence that is only potentially useful does not violate due process unless the State destroyed the evidence in bad faith. Because the trial court did not determine whether WDFW officers destroyed the clams in bad faith, we reverse and remand to the trial court to make that determination. On remand, the trial court may determine whether to take additional evidence on the issue of bad faith, and the court shall enter new findings of fact and conclusions of law.

Citations and pin cites are based on the Westlaw online version of the cited material.

BACKGROUND

Facts[1]

WDFW "is tasked with managing fisheries in the State of Washington to ensure that all participants are licensed and that catch amounts do not exceed sustainable levels for fish and shellfish populations."  To maintain accurate data on the various fisheries in the state, WDFW and the Northwest Indian Fish Commission require that all commercial wild fish and shellfish harvest, both state and tribal, be documented on Fish Receiving Tickets (FRT).

In September 2015, WDFW began an investigation into Puget Sound Seafood Distributors, LLC (PSSD) after the company was identified as the buyer of 444 pounds of illegally harvested, closed-season Dungeness crab from a crab poacher that WDFW had been actively investigating for several months.  WDFW knew that respondent Anthony Paul co-owned PSSD.  Respondent Hazen Shopbell was the other co-owner, as well as a fish buyer for PSSD.

Wholesale fish dealing companies often pay with checks, so WDFW obtained a search warrant for PSSD's financial accounts in an attempt to locate the check written to the crab poacher.  Upon review of records obtained pursuant

---

[1] The trial court based its ruling on the underlying motion to suppress on a stipulated factual record consisting of "the WDFW reports, photographs, Probable Cause Statement and transcript of WDFW Det. Wendy Willette's September 28, 2018 deposition filed with [the parties'] Motion to Suppress pleadings."  Accordingly, this statement of facts is drawn from those materials and from the trial court's unchallenged findings of fact.  See State ex. rel. Carroll v. Gatter, 43 Wn.2d 153, 155, 260 P.2d 360 (1953) ("When a case is submitted to the trial court upon stipulated facts, neither party will be heard to suggest on appeal that the facts were other than as stipulated."); State v. Bowman, 14 Wn. App. 2d 562, 567, 472 P.3d 332 (2020) (unchallenged findings are verities).

to the warrant, WDFW detective Wendy Willette found the check and noted numerous other checks written to fishermen. Nearly all of the checks written to fishermen also included an FRT number in the "note" section. Using the FRT number on each check, Willette was able to match checks to specific FRTs. During her review of the FRTs, Willette noted several violations, such as missing data as well as FRTs that were missing altogether.

Later, on August 12, 2016, Willette interviewed Jamie Torpey, a former fish buyer for PSSD. During the interview, Willette asked Torpey about specific FRTs and checks written to various individuals—in particular five checks, written on December 28, 2015, and January 8, 2016, to Carnegie Hayes, Merle Hayes, and Dayson Parks, known Tulalip tribal members. Having previously seen those checks during her review of PSSD's financial information, Willette had researched whether or not the Tulalip Tribe had any openings for any fishery "that would sell for such a low cost." Although there had been an open squid fishery around the time of the checks, there were no FRTs for squid, or any other product, during that time. There was no open commercial clam fishery, and the three individuals who received the checks also had no FRTs bearing their names.

Torpey reviewed copies of the checks and stated that they were for clams that were to be used as crab bait. She elaborated by saying that both Paul and Shopbell had "told her to go to Carnegie's house on the reservation and to buy the clams." Torpey stated that Paul told her not to fill out any FRTs for the clams but to issue the men checks. Torpey stated that when she bought the clams,

3

they were in laundry baskets and buckets. This type of container is inconsistent with legitimate shellfish harvest practices. Specifically, according to Willette's later report, "Typically, legally-harvested bivalve shellfish are bagged in mesh sacks, of uniform weight, and tagged with [Department of Health] Certification Tags. Laundry baskets and buckets are consistent with recreational or personal use shellfish harvest as well as with illegitimate commercial shellfish harvest."

Torpey said the clams were not dyed,[2] nor were they labeled, and she had to find plastic bags to put them in. Torpey told Willette that she had purchased clams for crab bait before from the Swinomish Tribe. Willette knew this to be the case because she had seen FRTs from June, July, and October detailing those purchases. Torpey stated that when the Swinomish Tribe harvested bait clams, they dyed the clams on the beach and the clams were tagged with certification tags. Torpey also stated that her contact at the Swinomish Tribe had advised her it was not legal for her to buy the clams from the Hayeses and Parks. Torpey stated that she then told Paul and Shopbell she was not going to buy the clams anymore. When Willette asked Torpey where the clams were now, Torpey responded that she had consolidated all of PSSD's bait, including clams, mackerel, squid, and sardines, into one cold storage facility, Marine View Cold Storage in Burlington (Marine View).

On August 15, 2016, Willette went to Marine View and requested copies of documents related to PSSD. She was provided with a shipping/receiving report

---

[2] According to the State, bait clams are required to be dyed under WAC 246-282-036.

4

that detailed "4 totes of clams, with weights of 643 lbs, 863 lbs, 1175 lbs, and 659 lbs, 1 pallet of mackerel at 958 lbs, and 1 pallet of squid and mackerel mix at 2838 lbs." Torpey was listed as the driver, and Willette recognized Torpey's signature on the form. Willette requested to inspect the product. She later described the inspection as follows:

> The totes were brought out of the freezer and I inspected them. Only three totes appeared to contain clams. The clams I saw were placed in black plastic garbage bags or just loosely sitting inside the totes on top of other bait products. There were no labels inside any of the bags of clams or with the loose clams. None of the clams I saw were dyed, but were all natural color. The clams I saw appeared to be butter clams and horse clams. These species of clams are found in Puget Sound waters. I photographed the totes, their weights and cold storage labels on the outside of the totes, and the clams.

Willette placed a "hold" on four totes of bait owned by PSSD. The hold prevented PSSD and others from accessing the totes or removing them from Marine View's facility.

On August 19, 2016, Willette interviewed Merle Hayes, one of the Tulalip tribal members whose names appeared on the checks Willette had earlier asked Torpey about. Hayes told Willette that he did dig clams and sell them "to a blonde lady that worked for [Shopbell]." Willette took this to mean Torpey. According to Willette's later report,

> Hayes stated that he believed they had sold clams once or twice in his driveway. Hayes stated he did not fill out any [FRTs] for the clams he sold to Torpey. He confirmed that the sales occurred in the winter and that they had been night tides. Hayes stated that none of the clams he dug had certification tags or were dyed. I asked how many clams he believed he personally had dug and sold to Torpey. Hayes stated he believed between 900 to 1100 pounds. He said he believed this was a total weight over three to four digs. I added the values of pounds recorded on the checks written to

5

Merle Hayes and saw that according to Torpey's notes, he sold 1936 pounds of clams to her between December 28, 2015 and January 11, 2016.

On August 22, 2016, Willette and other WDFW officers returned to Marine View to seize the clams belonging to PSSD. WDFW officers used a sledge hammer, hammer, and shovel to dislodge the frozen contents of the totes, "potentially damaging these items." Willette preserved samples from the four totes in four "baggies" that contained approximately 15 clams, one of which "appear[ed] to have been dyed a dark color." The officers removed the remaining contents of the totes and re-sorted them into two totes containing bait clams. The officers removed these two totes from Marine View and drove them to the Skagit County dump, where they were emptied into the waste disposal area. After the final weight of the two trucks carrying empty totes was tallied, the final weight of the clams that were destroyed, without the totes, was 1,180 pounds. Willette did not have a search warrant, subpoena, or other form of compulsory process authorizing the seizure of the clams; she relied on RCW 69.30.020 for legal authority to seize and destroy them.[3]

Procedure

In June 2018, the State charged Paul and Shopbell with various violations of RCW Chapter 77.15, the fish and wildlife enforcement code. Specifically, each

_____

[3] RCW 69.30.020 provides, "It is unlawful to sell or offer to sell shellfish in this state unless the shellfish bear an approved shellfish tag or label indicating compliance with the sanitary requirements of this state . . . . The department, a fish and wildlife officer, or an ex officio fish and wildlife officer may immediately seize containers of shellfish that are not affixed with an approved shellfish tag or label."

defendant was charged with two counts of unlawful use of fish buying and dealing licenses in the first degree (licensing counts), and three counts of unlawful trafficking in fish, shellfish, or wildlife in the second degree (trafficking counts).

In October 2018, Paul filed a motion to dismiss for lack of jurisdiction. Paul represented that both he and Shopbell were enrolled members of the Tulalip Tribe and that "PSSD's business plan was to purchase fish and shellfish from Tulalip Tribal fishermen and—as part of the purchase—sell bait . . . to those fishermen for use during the exercise of Treaty fishing rights."  Paul argued that Marine View was "the case's sole connection to Skagit County" and "all the alleged conduct in this case was related to Treaty fishing activities."  Thus, Paul argued, "any alleged violations should have been referred to Tulalip Tribal police and/or the Tulalip Tribal Prosecutor's Office for review and a filing determination," and "the State lacks jurisdiction to pursue criminal charges against tribal members exercising Treaty rights."

The State responded that neither PSSD's location nor Marine View were on the Tulalip reservation or on "usual and accustomed" grounds.[4]  The State also asserted that Paul and Shopbell were not being prosecuted for exercising treaty fishing rights but for "violations in documentation as a dealer of shellfish." Thus, the State argued, it had jurisdiction.

---

[4] "Usual and accustomed" grounds refer to " 'every fishing location where members of a tribe customarily fished from time to time at and before treaty times, however distant from the then usual habitat of the tribe, and whether or not other tribes then also fished in the same waters.' "  United States v. Lummi Nation, 876 F.3d 1004, 1007 (9th Cir. 2017).

In December 2018, the trial court denied Paul's motion to dismiss. That denial is not at issue in this appeal.

In March 2019, Paul, later joined by Shopbell, moved to suppress "all evidence, testimonial or documentary, pertaining to the bait clams" or, in the alternative, to dismiss all charges. Paul argued that suppression or dismissal was proper because WDFW's destruction of the bait clams was done in bad faith and deprived him of material exculpatory evidence in violation of due process. He maintained that the clams constituted material exculpatory evidence because without them, he could not present his defense, i.e., that the clams were legally harvested.

While Paul's motion to suppress was pending, the State amended its charges against both Paul and Shopbell to replace the two licensing counts with two counts of unlawful fish and shellfish catch accounting in the first degree (accounting counts), occurring between December 28, 2015 and January 11, 2016. The three trafficking counts, which alleged violations occurring between February 11, 2016, and May 9, 2016, remained the same. According to Willette's probable cause statement, Paul and Shopbell violated the law by:

> each directing an employee of their business, Jamie L. Torpey, . . . to purchase 4531 pounds of hardshell clams that were not harvested in accordance with State or Tribal seasons or in accordance with Washington State Department of Health laws and rules, and by directing that employee to not fill out required [FRTs] for eleven separate purchases between 12/28/15 and 01/11/16 totaling $3929.65[,]

> [and] selling 877.75 pounds of illegally harvested clams for bait for $1378.08 in thirteen separate transactions to crab fishers between 02/11/16 and 05/09/16.

8

In July 2019, the trial court, through a different judge than the judge who denied Paul's earlier motion to dismiss, entered an order suppressing "all evidence of the seizure, examination and destruction of the bait clams and other items seized on August 22, 2016 from Marine View" except the 15 retained clams.[5] The trial court made the following conclusions of law in connection with its order:

> C. The bait clams WDFW officers disposed of on August 22, 201[6] were useful and potentially exculpatory evidence for the defense.
> D. The retention of four baggies containing approximately 15 bait clams does not constitute a legally sufficient sample of the evidence WDFW intentionally destroyed.
> E. No comparable evidence exists to satisfy the constitutional requirement that the Defendant have an opportunity to present a complete defense.
> F. The WDFW's destruction of the bait clams violated the Defendant's constitutional right to access useful and exculpatory evidence.

The State appeals.[6]

## DISCUSSION

"The Fourteenth Amendment [to the United States Constitution] requires that criminal prosecutions conform with prevailing notions of fundamental fairness, and that criminal defendants be given a meaningful opportunity to present a complete defense." State v. Wittenbarger, 124 Wn.2d 467, 474, 880

---

[5] The trial court entered two separate orders: one in Shopbell's case and one in Paul's. Because the two orders are substantively the same, we refer to them collectively as a single order.

[6] The suppression order is reviewable under RAP 2.2(b)(2) because the trial court made an express determination that "[t]he practical effect of this order suppressing the evidence is to terminate the State's ability to prove the elements of each offense charged in the Amended Information."

P.2d 517 (1994) (citing California v. Trombetta, 467 U.S. 479, 104 S. Ct. 2528, 81 L. Ed. 2d 413 (1984)). To comport with due process, the prosecution has a duty to preserve material exculpatory evidence for use by the defense. Id. at 475 (citing Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963); Trombetta, 467 U.S. at 488).

This duty, however, is not absolute. Wittenbarger, 124 Wn.2d at 475 (observing that the United States Supreme Court "has been unwilling to 'impos[e] on the police an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution.' " (quoting Arizona v. Youngblood, 488 U.S. 51, 58, 109 S. Ct. 333, 102 L. Ed. 2d 281 (1988))). On the one hand, "[i]t is clear that if the State has failed to preserve 'material exculpatory evidence' criminal charges must be dismissed." Id. If the evidence at issue is merely " 'potentially useful evidence,' on the other hand, failure to preserve . . . is not a denial of due process unless the suspect can show bad faith by the State." State v. Armstrong, 188 Wn.2d 333, 345, 394 P.3d 373 (2017) (internal quotation marks omitted) (quoting Wittenbarger, 124 Wn.2d at 477). " 'Potentially useful' evidence is 'evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant.' " State v. Groth, 163 Wn. App. 548, 557, 261 P.3d 183 (2011) (quoting Youngblood, 488 U.S. at 57). We review de novo a trial court's materiality determination. State v. Davila, 184 Wn.2d 55, 74, 357 P.3d 636 (2015); see also State v. Burden, 104 Wn. App. 507, 512, 17 P.3d 1211 (2001)

("A trial court's determination that missing evidence is materially exculpatory is a legal conclusion which we review *de novo*.").

Here, in granting Paul and Shopbell's motion to suppress,[7] the trial court did not conclude that the destroyed clams were material exculpatory evidence. Instead, it concluded only that the clams "were useful and potentially exculpatory." We agree with the trial court inasmuch as it concluded that the clams did not constitute material exculpatory evidence and, thus, were only potentially useful.

To establish that evidence constitutes material exculpatory evidence, "[a] showing that the evidence might have exonerated the defendant is not enough." Wittenbarger, 124 Wn.2d at 475. Rather, "the evidence must both possess an exculpatory value that was apparent before it was destroyed and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." Id. (citing Trombetta, 467 U.S. at 489).

In the instant case, Paul and Shopbell were each charged with two counts of violating RCW 77.15.630(2), and three counts of violating RCW 77.15.260(1). RCW 77.15.630, pertaining to the accounting counts, provides in relevant part:

> (1) A person licensed as a commercial fisher, wholesale fish buyer, or limited fish seller, or a person not so licensed but acting in such a capacity, is guilty of unlawful fish and shellfish catch accounting in the second degree if he or she receives or delivers for commercial

---

[7] Ordinarily, dismissal—not suppression—is the remedy when the State destroys evidence in violation of due process. See Wittenbarger, 124 Wn.2d at 475 ("It is clear that if the State has failed to preserve 'material exculpatory evidence' criminal charges must be dismissed."). Nevertheless, the fact that the trial court entered a suppression order instead of dismissing the case does not affect our analysis of the underlying issue, i.e., whether the trial court erred in determining that the defendants were deprived of due process.

purposes fish or shellfish worth less than two hundred fifty dollars; and

(a) Fails to document such fish or shellfish with a [FRT] or other documentation required by statute or department rule;

(b) Fails to sign the [FRT] or other required documentation, fails to provide all of the information required by statute or department rule on the [FRT] or other documentation, or both; or

(c) Fails to submit the [FRT] to the department as required by statute or department rule.

*(2) A person is guilty of unlawful fish and shellfish catch accounting in the first degree if the person commits an act described by subsection (1) of this section and:*

(a) The violation involves fish or shellfish worth two hundred fifty dollars or more;

(b) The person acted with knowledge that the fish or shellfish were taken from a closed area, at a closed time, or by a person not licensed to take such fish or shellfish for commercial purposes; or

(c) The person acted with knowledge that the fish or shellfish were taken in violation of any tribal law.

(Emphasis added.) RCW 77.15.260(1), pertaining to the trafficking counts, provides in relevant part:

(1) A person is guilty of unlawful trafficking in . . . shellfish . . . in the second degree if the person traffics in . . . shellfish . . . with a wholesale value of less than two hundred fifty dollars and:

(a) The . . . shellfish . . . is classified as game, food fish, shellfish, game fish, or protected wildlife and the trafficking is not authorized by statute or department rule; or

(b) The . . . shellfish . . . is unclassified and the trafficking violates any department rule.

Below, Paul and Shopbell's primary argument—and the only argument they devote any briefing to on appeal—was that the destroyed clams constituted

material exculpatory evidence because if they were available, the clams could be traced back to a specific harvester and harvest location. According to Paul and Shopbell, the identity of the harvester and harvest location could then be used to prove that the State lacked prosecutorial jurisdiction and/or that the harvest and sale of the clams was lawful under the Tulalip Tribe's regulations. Also according to Paul and Shopbell, the Tulalip Tribe does not require FRTs or that bait clams be dyed. But even assuming that Paul and Shopbell are correct with regard to the Tulalip Tribe's requirements,[8] their assertion that the clams were material exculpatory evidence because they could be traced to an individual harvester and place of harvest fails for three reasons.

First, Paul and Shopbell's "tracing" theory is entirely speculative, and "[s]peculation that evidence might be exculpatory is not enough." State v. James, 26 Wn. App. 522, 525, 614 P.2d 207 (1980). Specifically, when the trial court asked at oral argument how the clams could be used to trace them to a harvester and location, defense counsel responded,

> So it would have been by species. So my surmise would be that if we had fish tickets for Cockle clams and we can say okay they bought Cockle clams from the Swinomish Tribe. Here's the weight. We add them all up, we go and separate all the clams by species and say, okay, this weight comes close to the amount of total weight on the [FRT]s for Cockle clams. Okay. We know where those came from.

_____

[8] The Tulalip Tribal Code (TTC) requires "Tulalip licensed fish buyers" to "completely and accurately fill out a treaty Indian [FRT] for each purchase of fish and shellfish." See TTC 8.05.180(3)(d). Additionally, the State points out that the Tulalip Tribe is party to a consent decree under which "tribes may engage in or authorize closed area shellfishing for bait," consistent with certain protocols. United States v. Washington, 19 F. Supp. 3d 1126, 1134, 1146-47 (W.D. Wash. 1994). One of those protocols is that bait shellstock be dyed and labeled " 'NOT FOR HUMAN CONSUMPTION—BAIT USE ONLY.' " Id. at 1157.

> All right. Let's go to the Butter clams. Let's figure out where Butter clams come from. And then we could have gone back and asked the tribal harvesters. You know, okay, like back in 2016 when you were harvesting Butter clams where would you go? *Then I assume they would be able to tell us oh, yeah, Butter clams grew here at this beach. And we harvested them this way because it was legal under our tribe regulation to do that. We could even call witnesses from the tribe to say oh, yeah, yeah that's totally appropriate.* But we can't do that because we have no idea how many Cockle clams were in those totes. We have no idea how many butter clams. We have no idea the other species of clams that were in the totes that got destroyed.

(Emphasis added.) In other words, defense counsel's explanation was premised on an *assumption* that, if certain clams could be traced back to a harvester, then that harvester would both recall when and where the clams were harvested and confirm that the harvest was conducted legally. But Paul and Shopbell made no offer of proof that (1) the physical clams would actually allow the defendants to trace them back to specific harvesters; (2) any harvester would be able to recall with specificity where or when a particular species of clam was harvested; or (3) any harvester would testify that the harvest was legal as opposed to illegal. Cf. State v. Potts, 93 Wn. App. 82, 89, 969 P.2d 494 (1998) (observing that evidence that "could have as easily been inculpatory as exculpatory" is not material exculpatory evidence).

Second, even assuming such tracing was technically possible, Paul and Shopbell fail to demonstrate that the clams' exculpatory value would have been apparent before they were destroyed. Indeed, as even Shopbell and Paul observe, "it is unclear how the WD[FW] agents could know where the clams were harvested, whether the sellers were tribal members or the weight of the clams

14

without ice."[9]

Third and finally, Paul and Shopbell fail to establish the clams were of such a nature that Paul and Shopbell would not have been able to obtain comparable evidence by other reasonably available means. According to Willette's probable cause statement, the charges against Paul and Shopbell arose out of transactions entered into within specified time frames. Accordingly, Paul and Shopbell could, just as Willette did, use PSSD's records or interview Torpey to identify the harvesters with whom they transacted during those time frames. Then, comparable evidence could have been obtained in the form of testimony from those harvesters. Paul and Shopbell do not persuade us that the clams themselves were necessary to trace their purchases back to a specific harvester.

In short, we hold that the destroyed clams were not material exculpatory evidence. Instead, because no more can be said of the clams "than that [they] could have been subjected to tests, the results of which might have exonerated" Paul and Shopbell, the clams were only potentially useful. Groth, 163 Wn. App. at 557. Therefore, their destruction did not violate due process unless it was done in bad faith. See Wittenbarger, 124 Wn.2d at 477 (holding that evidence that did not rise to the level of material exculpatory was "at best, only potentially

---

[9] Paul and Shopbell also argued below that the clams were material exculpatory evidence because without them, Paul and Shopbell could not defend against the State's allegation that the clams weighed enough to satisfy the 250-dollar value threshold for the accounting counts. See RCW 77.16.630(2)(a). They do not renew this argument on appeal, and rightly so: Nothing in the stipulated record indicates that it would have been apparent to WDFW officers that fewer than 250 dollars' worth of clams were involved in the seizure.

useful to the defense" and conducting bad faith analysis).

To this end, "[w]hether the State acted in bad faith is a question of fact that a defendant must establish." State v. Koeller, 15 Wn. App. 2d 245, 253, 477 P.3d 61 (2020). This is because " '[t]he presence or absence of bad faith . . . turn[s] on the police's knowledge of the exculpatory value of the evidence at the time it was . . . destroyed.' " Armstrong, 188 Wn.2d at 345 (internal quotation marks omitted) (third alteration added) (quoting Cunningham v. City of Wenatchee, 345 F.3d 802, 812 (9th Cir. 2003)). To establish bad faith, the defendant "must 'put forward specific, nonconclusory factual allegations that establish improper motive.' " Id. (quoting Cunningham, 345 F.3d at 812).

The trial court did not make a finding that WDFW officers destroyed the clams in bad faith. In the absence of that required finding, we must reverse the trial court's determination that the destruction of the clams violated due process. But reversal does not end our analysis. Here, the trial court did not just fail to find that WDFW officers destroyed the clams in bad faith, the court appears not to have even *considered* the issue of the officers' bad faith. The court did not make any findings with regard to what WDFW officers knew or did not know when they destroyed the clams, any findings with regard to WDFW officers' motivations for destroying the clams, or any other findings that suggest it evaluated WDFW's good or bad faith. Under these circumstances, we decline to consider the issue of bad faith in the first instance—rather, the proper course is to remand to the trial court for an opportunity to pass upon that issue. See RAP 12.2 ("The appellate court may reverse, affirm, or modify the decision being

reviewed *and take any other actions as the merits of the case and the interest of justice may require*." (emphasis added)); cf. Hay v. Chehalis Mill Co., 172 Wash. 102, 110, 19 P.2d 397 (1933) (remanding to trial court to consider material issue where it appeared the trial court did not consider the issue at all and instead rested its judgment on an erroneous legal ground, observing, "We do not think that we are called upon, or that it is proper for us, to pass upon that issue without first giving the trial court an opportunity of doing so.").

We reverse and remand to the trial court to determine whether WDFW officers destroyed the clams in bad faith. On remand, the trial court may determine whether to take additional evidence on the issue of bad faith, and shall enter new findings of fact and conclusions of law. In any case, this opinion terminates our review of the instant matter.

_____
Coburn, J.

WE CONCUR:

_____          _____
Bowman, J.                          Verellen, J.