**NOTICE:   SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

FILE

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
NOVEMBER 10, 2021

*Gonzáles, C.J.*
CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
NOVEMBER 10, 2021

ERIN L. LENNON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | NO. 99062-0 |
| Petitioner, | |
| v. | EN BANC |
| REECE WILLIAM BOWMAN, | |
| Respondent. | Filed: November 10, 2021 |

STEPHENS, J.—Nearly 50 years since their introduction, cell phones are widely recognized as an essential way for individuals to stay connected to one another. *See, e.g.*, *Riley v. California*, 573 U.S. 373, 385, 134 S. Ct. 2473, 189 L. Ed. 2d 430 (2014) ("[M]odern cell phones . . . are now such a pervasive and insistent part of daily life that the proverbial visitor from Mars might conclude they were an important feature of human anatomy."). As cell phones made text messaging a ubiquitous form of communication, we recognized that text message conversations constitute "a private affair protected by the state constitution from warrantless intrusion." *State v. Hinton*, 179 Wn.2d 862, 865, 319 P.3d 9 (2014). This court, in *Hinton*, held that an individual whose text messages are unlawfully searched on an associate's cell phone could challenge that search in a subsequent prosecution—

*State v. Bowman*, No. 99062-0

rejecting the view of some of our sister states that any privacy interest in a text message is lost once the message is sent.[1]

In this case, we are asked to extend *Hinton* to prohibit law enforcement from using information obtained from the lawful, consensual search of a third party's cell phone to set up a separate text message exchange on a different cell phone between Reece Bowman and an undercover agent posing as Bowman's associate. Specifically, Bowman argues that both the search and the ruse violated his rights under article I, section 7 of the Washington State Constitution, as well as the Fourth Amendment to the United States Constitution, by intruding on a private affair without authority of law. We reject these arguments.

Consistent with long-standing precedent, we hold that a cell phone owner's voluntary consent to search text messages on their phone provides law enforcement with the authority of law necessary to justify intruding on an otherwise private affair. We also hold that a subsequent police ruse using lawfully obtained information does not constitute a privacy invasion or trespass in violation of either our state constitution or the United States Constitution. We reverse the Court of Appeals and

---

[1] *See, e.g.*, *Fetsch v. City of Roseburg*, No. 6:11-cv-6343-TC, 2012 WL 6742665 (D. Or. Dec. 31, 2012) (court order) (finding no reasonable expectation of privacy in sent text messages).

2

*State v. Bowman*, No. 99062-0

reinstate Bowman's conviction, directing the trial court to modify his sentence as addressed below.

RELEVANT FACTS AND PROCEDURAL HISTORY

Agents from the Department of Homeland Security identified Reece Bowman as an alleged drug dealer after arresting and interviewing one of Bowman's associates, Mike Schabell, in an unrelated police operation. Police arrested Schabell again in February 2017, and Schabell consented to Agent Marco Dkane searching his cell phone. During the search, Dkane saw a text message string between Schabell and Bowman that suggested Bowman sold Schabell methamphetamine earlier that day. Using the cell phone number shown for Bowman on Schabell's phone, Dkane texted Bowman from his own phone, posing as Schabell looking to buy more drugs:

> [Dkane:] Hey Reese, it's [M]ike. I got a burner [phone] [be]cause my old school phone went to sh**.
>
> [Dkane:] You avail[able]?
>
> [Dkane:] ?
>
> [Bowman:] Yes[.]
>
> [Dkane:] Got cash can I re-up?
>
> [Dkane:] I could meet you back in Ballard?
>
> [Dkane:] ? Lemme know please[.]
>
> [Bowman:] Yeah what Mike is this[?]

3

[Dkane:] Schabell.  Dude from today.

[Dkane:] Serious?

[Dkane:] I just wanna know if I can get some.  Lemme know please.
. . . .

[Bowman:] Mike come on then.  Didn[']t realize who this was[.]

[Bowman:] ["thumbs up" emoji]

[Bowman:] Call me.

[Dkane:] I'm with my old lady.  Can you meet or no?
. . . .

[Bowman:] Yes[.]

. . . .

[Dkane:] Where do you want me to come to?

. . . .

[Bowman:] 7-11 same one[.]

[Dkane:] Ok. I can be there by 10[pm].

[Dkane:] Can I get [$]500 of clear?[2]

[Bowman:] Sure[.]

Clerk's Papers (CP) at 45-49; 2 Verbatim Report of Proceedings (VRP) (May 3, 2018) at 273-74.  When Bowman arrived at the designated meeting place, Dkane

---

[2] "Clear" is another name for methamphetamine.

4

confirmed Bowman's identity and police arrested him. They found 3.5 grams of methamphetamine on Bowman's person and another 55.2 grams of methamphetamine, digital scales, and $610 in cash in his car.

The State charged Bowman with possession of methamphetamine with intent to deliver in violation of the Uniform Controlled Substances Act, RCW 69.50.401(1), (2)(c). Before trial, Bowman moved to suppress all evidence against him and to dismiss the pending charges, arguing police obtained the evidence in violation of his privacy rights under article I, section 7 of the Washington State Constitution and the Fourth Amendment to the United States Constitution. Relying on our holding in *Hinton*, Bowman argued that police needed a warrant or exigent circumstances to access the text messages Bowman sent to Schabell's phone and to impersonate Schabell in the later ruse. The trial court denied the motion, distinguishing *Hinton* because "here, the police used his own phone and his own phone number to contact Mr. Bowman who actually questioned the caller." 1 VRP (May 2, 2018) at 98. The court determined the ruse did not violate Bowman's privacy rights because "police are allowed to use a tactic or ruse to contact a defendant as part of their police investigation." *Id.* at 99. A jury found Bowman guilty as charged.

Bowman appealed, and the Court of Appeals reversed his conviction in a published opinion, holding law enforcement violated Bowman's right to privacy

under article I, section 7 of the Washington State Constitution. *State v. Bowman*, 14 Wn. App. 2d 562, 564, 472 P.3d 332 (2020). The court determined *Hinton* gave Bowman a privacy interest in his text message conversations with known contacts and that this right prevented Dkane from engaging him in communications posing as Schabell because Bowman "reasonably believed he was texting with a known contact." *Id.* at 569.

The State petitioned this court for discretionary review. Bowman conditionally cross petitioned for review of three separate issues that the Court of Appeals did not address: (1) whether the text messages sent by Dkane to Bowman's phone constitute a trespass, (2) whether the trial court improperly imposed a supervision fee for community custody, and (3) whether the judgment and sentence erroneously allows interest to accrue on legal financial obligations (LFOs). We granted the petition for review as well as the three issues raised in Bowman's cross petition. *State v. Bowman*, 196 Wn.2d 1031 (2021). We accepted an amici brief from the Washington Association of Criminal Defense Lawyers, the American Civil Liberties Union of Washington, the Washington Defenders Association, and the King County Department of Public Defense.

## ANALYSIS

The trial court correctly denied Bowman's motion to suppress evidence obtained from the police ruse because there was no unlawful search of Schabell's

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

cell phone. Neither the search nor the ruse violated Bowman's privacy rights under the state and federal constitutions. We reverse the Court of Appeals and remand to the trial court to reinstate Bowman's conviction and modify his sentence, as described below.

Under article I, section 7 of our state constitution, "[n]o person shall be disturbed in his private affairs, or his home invaded, without authority of law." The United States Constitution provides, "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. CONST. amend. IV. This right extends to an individual's reasonable expectation of privacy. *Katz v. United States*, 389 U.S. 347, 360-61, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967) (Harlan, J., concurring). Our state's private affairs analysis "is broader than the Fourth Amendment's reasonable expectation of privacy." *Hinton*, 179 Wn.2d at 868 (citing *State v. Young*, 123 Wn.2d 173, 181, 867 P.2d 593 (1994)).

The law enforcement conduct in this case did not violate either article I, section 7 of our constitution or the Fourth Amendment to the United States Constitution. While Bowman retained a privacy interest in the text messages he sent to Schabell, Dkane acted with authority of law in viewing the text messages based on Schabell's consent to search that phone. The ruse that followed simply capitalized on validly obtained information and did not intrude on Bowman's private

7

affairs. Nor was the ruse a trespass under either the United States Constitution or our state constitution. The text messages sent by Dkane did not physically invade Bowman's cell phone or otherwise manipulate it, and Bowman suffered no trespass but instead willingly disclosed incriminating information.

I.    Law Enforcement Did Not Violate Bowman's Rights under Article I, Section 7 Because No Illegal Search Occurred and the Ruse Did Not Implicate a Private Affair

In accepting Bowman's argument based on *Hinton*, the Court of Appeals improperly expanded the holding in that case beyond the context of unlawfully seized text messages on the cell phone of a known contact. *See Bowman*, 14 Wn. App. 2d at 569 (noting "Bowman reasonably believed he was texting with a known contact" and "had a reasonable expectation of privacy for th[e] conversation [with Dkane]"). Such expansive reasoning skips over the relevant article I, section 7 analysis under the facts of both *Hinton* and this case.

We follow a two-part inquiry to determine when a violation of article I, section 7 of our state constitution has occurred, asking (1) whether the government intruded on a private affair and, if so, (2) whether the governmental conduct was justified by authority of law. *State v. Miles*, 160 Wn.2d 236, 243-44, 156 P.3d 864 (2007). Our definition of "private affairs" focuses on "those privacy interests which citizens of this state have held, and should be entitled to hold, safe from governmental trespass absent a warrant." *State v. Myrick*, 102 Wn.2d 506, 511, 688 P.2d 151 (1984). For

example, we recognize that individuals have a constitutionally protected privacy interest in information on their cellular devices. *See State v. Samalia*, 186 Wn.2d 262, 269, 375 P.3d 1082 (2016) (noting cell phones "may contain intimate details about individuals' lives, which we have previously held are protected under article I, section 7"). But "if the State has not intruded unreasonably into someone's private affairs, no search has occurred and article [I], section 7 has not been violated." *State v. Goucher*, 124 Wn.2d 778, 783-84, 881 P.2d 210 (1994) (citing *Young*, 123 Wn.2d at 181).

When a search implicates a private affair, we then consider the "authority of law" needed to justify the intrusion—generally a valid warrant. *Miles*, 160 Wn.2d at 244. But "there are a few 'jealously and carefully drawn exceptions' to the warrant requirement, including consent." *State v. Reichenbach*, 153 Wn.2d 126, 131, 101 P.3d 80 (2004) (citations omitted) (quoting *State v. Hendrickson*, 129 Wn.2d 61, 70-71, 917 P.2d 563 (1996)). It is the State's burden to prove an exception applies. *State v. Muhammad*, 194 Wn.2d 577, 596, 451 P.3d 1060 (2019) (plurality opinion). The consent exception requires the State show that consent to search is voluntary, the consenting party has authority to consent, and the search does not exceed the scope of the consent. *Reichenbach*, 153 Wn.2d at 131 (citing *State v. Thompson*, 151 Wn.2d 793, 803, 92 P.3d 228 (2004); *State v. Nedergard*, 51 Wn. App. 304, 308, 753 P.2d 526 (1988)).

9

*State v. Bowman*, No. 99062-0

In *Hinton*, we considered whether an individual who sends text messages retains a privacy interest in their messages on a recipient's device. There, police retained an individual's phone following an arrest. A detective then searched that phone without a warrant or consent; texted the defendant from the same phone, posing as the defendant's associate; and arranged a drug deal. In analyzing the relevant privacy rights, we noted the open question at issue was whether an individual retains any privacy interest in a text message once they hit "send." Other jurisdictions had expressed differing views on this question under the Fourth Amendment. *See Hinton*, 179 Wn.2d at 867-68 (comparing *State v. Patino*, No. P1-10-1155A, slip op. (R.I. Super. Ct. Sept. 4, 2012) (finding the sender had a reasonable expectation of privacy in sent texts), *aff'd in part, vacated in part*, 93 A.3d 40 (2014), with *Fetsch v. City of Roseburg*, No. 6:11-cv-6343-TC, 2012 WL 6742665 (D. Or. Dec. 31, 2012) (court order) (finding no reasonable expectation of privacy)). We resolved the issue in *Hinton* on state constitutional grounds, holding the defendant "retained a privacy interest in the text messages he sent, which were delivered to [an associate]'s phone but never received by [the associate]." *Id.* at 873. Notably, the State did not argue there was authority of law for the warrantless search of Hinton's associate's cell phone, instead insisting that "the text message communications were not 'private affairs' under our constitution." *Id.* at 869. In rejecting the State's argument, we also noted the lack of any authority of law for the

10

*State v. Bowman*, No. 99062-0

cell phone search based on "the scope and extent of the detective's intrusive conduct." *Id.* at 875; *see also id.* at 882 (C. Johnson, J., concurring) ("[T]here is no evidence that Lee consented to the search of his phone.").

The dissent in *Hinton* challenged the defendant's standing to assert a constitutional privacy interest in text messages stored on a third party's device. But the majority rejected this argument, holding that Hinton had standing to challenge the search "if the search disturbed a privacy interest he had in his text messages to [the third party]." *Id.* at 869 n.2; *see also id.* at 880 (C. Johnson, J., concurring) ("[I]t is the determination of a constitutionally protectable interest, or private affair, that gives rise to the ability to challenge the warrantless search by the government."). Drawing on the recognized privacy interest in text messages, the majority and concurrence recognized the distinction between conduct that permissibly intrudes on a private affair and conduct that does not. *See id.* at 874 ("Hinton certainly assumed the risk that Lee would betray him to police, but Lee did not consent to the officer's conduct."), 881 (C. Johnson, J., concurring) ("The sender of a text message assumes a limited risk that the recipient may voluntarily expose that message to a third party, but . . . the sender does not assume the risk that the police will search the phone in a manner that violates the phone owner's rights.").

Here, the Court of Appeals correctly recognized that *Hinton* established a "privacy interest in text message conversations with known contacts." 14 Wn. App.

11

*State v. Bowman*, No. 99062-0

2d at 567. But, all too quickly, the court inaccurately rephrased this holding as extending to the *reasonable belief* that one is texting "with a 'known contact.'" *Id.* at 568 (quoting *Hinton*, 179 Wn.2d at 876). Relatedly, the Court of Appeals erroneously analyzed the conduct here as a single, uninterrupted conversation between Bowman and the person Bowman perceived to be Schabell. In so doing, it overlooked key distinctions between the facts in *Hinton* compared to the facts here.

Unlike in *Hinton*, this case does not involve the illegal search of a cell phone; Schabell expressly consented to Dkane searching his phone, so there was no unlawful search. For purposes of our article I, section 7 analysis, it is helpful to consider the law enforcement conduct at issue in two separate phases: (1) Dkane's access to Schabell's phone, including text messages and contact information, and (2) the later ruse involving Dkane posing as Schabell using a different cell phone.

As to the search of Schabell's cell phone, Bowman does retain a privacy interest in the text messages he sent to a third party's device. *Hinton*, 179 Wn.2d at 865. As we observed in *Hinton*, "one who has a conversation with a known associate through personal text messaging exposes some information but does not expect governmental intrusion." *Id.* at 875. That said, Schabell's consent to search his phone provided Dkane with the necessary authority of law to view the text message conversation. *See Reichenbach*, 153 Wn.2d at 131 (recognizing consent as one of the narrow exceptions to the warrant requirement). A defendant's *expectation* for

12

purposes of the private affairs analysis is separate from whether the intrusion is justified by authority of law, such as the phone owner's express consent.

The Court of Appeals rejected the relevancy of the consent search in this case by focusing on the wrong consent. The court reasoned that Schabell "had no privacy interest [in the conversation between Dkane and Bowman] and had no authority to consent to invasion of the privacy interest that under *Hinton* was held by Bowman." 14 Wn. App. 2d at 570. This reasoning obscures the procedural backdrop of *Hinton*, which concerned the defendant's standing to challenge the unlawful search of his messages on an associate's device. Our holding in *Hinton* recognized the relevant "standing analysis basically duplicates the substantive article I, section 7 analysis"— with both considering whether a private affair has been disturbed. 179 Wn.2d at 869 n.2. The scope of the privacy right established in *Hinton* was necessarily tied to the illegal search or "disturbance" of the third party's phone without a warrant or consent. But, here, no such illegal search occurred because Schabell consented to the search of his cell phone. There is no precedent for requiring further "consent" for Dkane to use the information he obtained from the lawful search of Schabell's phone to then engage Bowman in a new text message exchange on a law enforcement device. To accept the Court of Appeals's interpretation of consent

*State v. Bowman*, No. 99062-0

would unduly expand *Hinton* and suggest that a defendant can forever control the information he willingly shares with an associate who might choose to reveal it.[3]

With respect to Dkane's ruse in posing as Schabell to text Bowman from a different cell phone, we begin by considering the long line of precedent examining the constitutional limits of privacy rights in the context of police investigations. In interpreting the United States Constitution, the Supreme Court has never "expressed the view that the Fourth Amendment protects a wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it." *Hoffa v. United States*, 385 U.S. 293, 302, 87 S. Ct. 408, 17 L. Ed. 2d 374 (1966). The *Hoffa* Court held there was "no interest legitimately protected by the Fourth Amendment" where infamous labor leader James "Jimmy" Hoffa made incriminating statements about jury tampering to an associate who was cooperating with law enforcement. *Id.*

The *Hoffa* case aligns with Washington precedent recognizing similar situations in which law enforcement strategies or ruses do not violate state constitutional privacy rights. *See, e.g.*, *Goucher*, 124 Wn.2d at 781, 786-87 (holding

---

[3] The Court of Appeals similarly focused on the wrong "consent" in suggesting Dkane's conduct exceeded the scope of Schabell's consent because "the record does not indicate that Schabell consented to being impersonated." 14 Wn. App. 2d at 570. Neither Bowman nor the Court of Appeals identify any authority for the proposition that an individual who voluntarily discloses information must further consent to police using that information in an investigation.

14

*State v. Bowman*, No. 99062-0

no article I, section 7 violation occurred where a detective, while executing a search warrant at a residence, answered a phone call placed by the defendant by stating he was "handling business," inducing the defendant to arrange to buy drugs); *see also State v. Athan*, 160 Wn.2d 354, 367-68, 158 P.3d 27 (2007) (holding the defendant lacked a privacy interest in his saliva recovered from an envelope he voluntarily mailed to detectives posing as a fictitious law firm).

Like the defendants in *Goucher* and *Athan*, Bowman voluntarily disclosed incriminating information to a recipient, albeit under the mistaken belief he was texting with an associate. As in *Athan*, "[t]he fact that he was not aware the recipient was a police detective does not vitiate that consent." 160 Wn.2d at 371. Relatedly, the possibility that Schabell might betray Bowman and consent to the search of his phone that made the ruse possible in the first place is a risk Bowman, like every individual, must assume. One's privacy interest does not encompass a right to prevent their associates from disclosing confidences or cooperating with law enforcement.

Nothing in *Hinton* detracts from this analysis. Indeed, there, we distinguished the factual circumstances in *Goucher* and *Athan*—involving defendants who "voluntarily disclosed information to strangers"— with Hinton who, in contrast, had "no indication that anyone other than [his known associate] possessed the phone" and "reasonably believed he was disclosing information to his known contact."

15

*Hinton*, 179 Wn.2d at 876; *see also id.* at 871 (noting "individuals closely associate with and identify themselves by their cell phone numbers, such that the possibility that someone else will possess an individual's phone is 'unreflective of contemporary cell phone usage'" (quoting *Patino*, slip op. at 70)). The facts here show Bowman not only had reason to question who was sending him a text message from an unknown number but, in fact, did so. *See* CP at 45 (Dkane claims to be "[M]ike" on a new phone, and Bowman asks, "What Mike is this[?]").

More critical to the article I, section 7 analysis is the key distinction that police unlawfully searched Hinton's associate's cell phone to discover his identity and cell contact, while law enforcement in *Goucher* and *Athan* capitalized on lawfully obtained information. *See Goucher*, 124 Wn.2d at 780 (recognizing lawfulness of search of residence before the phone conversation leading to defendant's arrest); *Athan*, 160 Wn.2d at 374 ("The analysis of DNA obtained without forcible compulsion . . . is not a search under the Fourth Amendment." (citing *State v. Coleman*, 122 Ariz. 130, 133, 593 P.2d 684 (Ct. App. 1978)). In *Hinton*, the concurrence correctly observed that the relevant constitutional analysis implicated the "fruit of the poisonous tree" doctrine. 179 Wn.2d at 882 (C. Johnson, J., concurring) ("[B]ecause the phone was searched without a warrant, an exception, or consent, any evidence derived from the search . . . is fruit of the poisonous tree."). In the present case, there is no poisonous tree, and the Court of Appeals erroneously

16

focused on the constitutionality of the ruse, rather than the search. Simply stated, there is no privacy interest in not being fooled; instead, the relevant inquiry is whether the cell phone search that yielded the information used to set up the ruse was supported by authority of law.

*Hinton* was significant in recognizing an individual's privacy interest in their text messages on the device of a known contact and their standing to assert a constitutional violation where law enforcement invades that privacy interest *without* authority of law. That decision did not, however, recognize a right under article I, section 7 to be free from police ruses or undercover investigations.[4]

In line with precedent, we hold Dkane did not intrude on Bowman's private affairs when he engaged Bowman in a text message exchange by impersonating Schabell on a separate undercover device—using information lawfully obtained as a result of Schabell's prior cooperation with police and consent to search. We turn next to Bowman's argument that the text messages sent by Dkane constituted an unconstitutional trespass under federal and state law.

---

[4] Our analysis here is limited to consideration of the privacy issues raised by Bowman and should not be read as giving law enforcement unfettered discretion to engage in ruses that violate a defendant's due process rights. *See Athan*, 160 Wn.2d at 371 (recognizing due process limits on policy ruses); *see also State v. Lively*, 130 Wn.2d 1, 23, 26, 921 P.2d 1035 (1996) (holding government informant's attendance at addiction recovery meetings "could best be described as 'trolling for targets' for the police undercover operation" and "was so outrageous that it shocks the universal sense of justice").

*State v. Bowman*, No. 99062-0

II.     Law Enforcement Did Not Commit an Unconstitutional Trespass by Sending Text Messages to Bowman's Cell Phone as Part of a Ruse

Bowman separately argues that Dkane's conduct in sending him "uninvited and fraudulent text messages . . . with the purpose of learning information" constitutes a trespass or trespass to chattels in violation of both the Washington State Constitution and the United States Constitution. Suppl. Br. of Resp't at 12. This argument, which was not addressed by the appellate court below, is unavailing.

For much of the 20th century, the Supreme Court's "Fourth Amendment jurisprudence was tied to common-law trespass" and applied only to constitutionally protected areas such as persons, houses, papers, and effects. *Kyllo v. United States*, 533 U.S. 27, 31, 121 S. Ct. 2038, 150 L. Ed. 2d 94 (2001) (collecting cases). This conception of the Fourth Amendment shifted following the Court's decision in *Katz*, holding "the Fourth Amendment protects people, not places." 389 U.S. at 351. Following *Katz*, the Supreme Court test for analyzing whether government conduct qualifies as a "search" or "seizure" turns on an individual's "reasonable expectation of privacy," which is both objective and subjective in nature. *Id.* at 360-61 (Harlan, J., concurring). Later Supreme Court cases have reasoned that to the extent the *Katz* test expanded the Fourth Amendment's baseline protections, "it does not subtract anything from the Amendment's protections 'when the Government *does* engage in [a] physical intrusion of a constitutionally protected area.'" *Florida v. Jardines*, 569

18

U.S. 1, 5, 133 S. Ct. 1409, 185 L. Ed. 2d 495 (2013) (alteration in original) (quoting

*United States v. Knotts*, 460 U.S. 276, 286, 103 S. Ct. 1081, 75 L. Ed. 2d 55 (1983)

(Brennan, J., concurring in the judgment)).

Bowman argues two Supreme Court decisions involving common law

trespass analysis under the Fourth Amendment are relevant here: *United States v.*

*Jones*, 565 U.S. 400, 132 S. Ct. 945, 181 L. Ed. 2d 911 (2012) (holding the

government's installation of a tracking device to the defendant's vehicle to monitor

the vehicle's movements constituted a search), and *Jardines*, 569 U.S. at 11-12

(holding the government's use of trained police dogs to investigate the porch

outside the defendant's home constituted a search). But in both of those cases,

"[t]he government physically occupied private property for the purpose of obtaining

information." *Jones*, 565 U.S. at 404; *see also Jardines*, 569 U.S. at 6 (noting the

officers collected "information by physically entering and occupying the area to

engage in conduct not explicitly or implicitly permitted by the homeowner"). The

*physical* component of common-law trespass analysis led the concurrence in *Jones*

to criticize the majority's test for "provid[ing] little guidance" in cases involving

"electronic or other novel modes of surveillance that do not depend upon a physical

invasion." 565 U.S. at 415 (Sotomayor, J., concurring). But this criticism does not

change the fact that common-law trespass still requires a physical or equivalent

invasion. *See id.* at 411 ("Situations involving merely the transmission of electronic

19

signals without trespass would remain subject to *Katz* analysis." (emphasis omitted)).

Bowman counters with a federal case recognizing the trespass theory is not limited to physical spaces "and includes electronic or digital trespasses." Suppl. Br. of Resp't at 15 (citing *United States v. Ackerman*, 831 F.3d 1292, 1307-08 (10th Cir. 2016)). *Ackerman* is distinguishable from the facts in this case. There, the defendant's e-mail "never made it to its intended recipient" due to an automated filter designed to screen for child pornography and forward the attached images to the federal government. 831 F.3d at 1294. Here, in contrast, Bowman's original text messages to Schabell's cell phone were delivered and received by the intended recipient, Schabell. Schabell's consent to search his phone gave law enforcement the information they needed to then begin a separate conversation on a new phone with Bowman—but no interception of the text messages sent by Bowman ever occurred.[5]

---

[5] Bowman separately argues he suffered a trespass to chattel because the text messages sent by Dkane "placed data onto [Bowman's] phone" and "sapped its power resources." Suppl. Br. of Resp't at 17. For support, he cites *Jones v. United States*, 168 A.3d 703, 716 n.27 (D.C. 2017), where the court suggested the government's use of a cell-site simulator to coopt the defendant's phone and "forc[e] it to do something [the defendant] surely never intended it to do" plausibly constituted a trespass to his chattel (i.e., his cell phone). But, here, Bowman's phone was neither hacked nor subjected to interference by police. Bowman points to one lower federal court decision recognizing a viable trespass to chattel tort claim for a plaintiff who received repeated and unsolicited telemarketer robocalls. *See Mohon v. Agentra LLC*, 400 F. Supp. 3d 1189, 1238-39, 1245 (D.N.M. 2019). But civil liability for claims of trespass to chattel or intrusion upon seclusion is ill fitted to a criminal

*State v. Bowman*, No. 99062-0

Bowman's argument goes too far in suggesting that the text messages sent by Dkane as part of a police ruse constitute a trespass even though the ruse utilized lawfully obtained information. This case differs from the Supreme Court cases where police unfairly utilized technology to gather information that could not otherwise be obtained without a physical intrusion. *See, e.g.*, *Kyllo*, 533 U.S. at 34 (holding use of sense-enhancing technology to gather information about the interior of a home constituted a search where "the technology in question is not in general public use"). Here, Dkane texted Bowman from a cell phone number unknown to Bowman, utilizing information obtained from a consensual search of Schabell's phone and a prior interview with Schabell himself. The messages sent by Dkane posing as Schabell provided the means to engage in the ruse, but Dkane's text messages, by themselves, could not reveal private information about Bowman.

Instead, Bowman had the choice to ignore the text messages or to respond— and his decision to respond supplied the potentially incriminating information. No physical trespass occurred. Even if we accept that a trespass may include the mere transmission of electronic signals, Bowman's characterization of the text messages as "unwanted" followed only from his realization that he had been deceived. That

---

case involving a police ruse. And state law prohibiting electronic impersonation does not apply to impersonations "[p]erformed by a law enforcement agency as part of a lawful criminal investigation." RCW 4.24.790(4)(d). Accordingly, we reject Bowman's trespass to chattel claim.

he misunderstood the identity of the person he was texting does not transform the unsolicited incoming message into an unconstitutional trespass. *See Lopez v. United States*, 373 U.S. 427, 465, 83 S. Ct. 1381, 10 L. Ed. 2d 462 (1963) (Brennan, J., dissenting) ("The risk of being . . . betrayed by an informer or deceived as to the identity of one with whom one deals is probably inherent in the conditions of human society."). We hold that the law enforcement ruse did not constitute a trespass for purposes of the Fourth Amendment to the United States Constitution or article I, section 7 of the Washington State Constitution.[6]

Because the result of our decision today is to reinstate Bowman's conviction, we turn to his challenge to aspects of the sentence imposed.

---

[6] Bowman correctly observes that we have not previously addressed whether the Fourth Amendment's trespass analysis under *Jones* and *Jardines* applies under article I, section 7 of our state constitution. Article I, section 7 of our constitution "'requires no less' than the Fourth Amendment." *State v. Afana*, 169 Wn.2d 169, 177, 233 P.3d 879 (2010) (quoting *State v. Patton*, 167 Wn.2d 379, 394, 219 P.3d 651 (2009)). But Bowman fails to articulate how our article I, section 7 test falls short of the protections offered by the Supreme Court's trespass analysis. *See, e.g.*, *Muhammad*, 194 Wn.2d at 586 (recognizing private affairs under our state constitutional test as those privacy interests that are and should be held "'safe from *governmental trespass* absent a warrant'" (emphasis added) (quoting *Myrick*, 102 Wn.2d at 511). To the extent common-law trespass interweaves with our private affairs inquiry under article I, section 7 of the state constitution, no such trespass occurred under the facts of this case.

III.     The Discretionary Supervision Fee Should Be Stricken from Bowman's Judgment and Sentence, but the Trial Court Did Not Erroneously Impose Interest on Other Fees

Bowman raises two procedural challenges to his judgment and sentence. The first challenge relates to the imposition of a discretionary supervision fee. During Bowman's sentencing, the trial court did not order a separate DNA (deoxyribonucleic acid) fee and waived "any other non-mandatory fees and interest." 3 VRP (Sept. 28, 2018) at 433. Despite this, the court ordered Bowman to pay a supervision fee as a condition of community custody. The Court of Appeals has correctly recognized that because "supervision fees are waivable by the trial court, they are discretionary LFOs." *State v. Dillon*, 12 Wn. App. 2d 133, 152, 456 P.3d 1199 (citing *State v. Lundstrom*, 6 Wn. App. 2d 388, 396 n.3, 429 P.3d 1116 (2018)), *review denied*, 195 Wn.2d 1022 (2020). Similar to this case, the record in *Dillon* demonstrated that the trial court intended to impose only *mandatory* LFOs; thus, the Court of Appeals determined the discretionary supervision fee was inadvertently imposed and ordered it be stricken from the judgment and sentence. *Id.* In accord with *Dillon*, we agree that the trial court committed procedural error by imposing a discretionary fee where it had otherwise agreed to waive such fees. We order the fee be stricken from the judgment and sentence.

Bowman also argues his judgment and sentence violates state law to the extent it provides that his nonrestitution LFOs shall bear interest. *See* RCW 3.50.100(4)(b)

23

*State v. Bowman*, No. 99062-0

("As of June 7, 2018, penalties, fines, . . . fees, and costs imposed against a defendant in a criminal proceeding shall not accrue interest."). Bowman's judgment and sentence states his financial obligations shall bear interest pursuant to RCW 10.82.090, which provides that "[a]s of June 7, 2018, no interest shall accrue on nonrestitution legal financial obligations." RCW 10.82.090(1). Bowman was sentenced in September 2018, after the provisions of relevant state law prohibited the accrual of interest on particular LFOs. Reading the judgment and sentence in this context, it becomes clear that Bowman is subject to interest only for restitution, which was not actually ordered in this case. Therefore, the judgment and sentence does not improperly allow interest to accrue on Bowman's other fees.

## CONCLUSION

We reverse the Court of Appeals and reinstate Bowman's conviction. While our decision in *Hinton* recognizes that an individual retains a privacy interest in text messages sent to a known associate's cell phone, it does not bar police ruses that capitalize on lawfully obtained information. Here, Schabell consented to the search of his cell phone, and law enforcement acted with authority of law in viewing Bowman's text messages on Schabell's phone. The ruse that followed, with Agent Dkane posing as Schabell to arrange another drug transaction with Bowman, did not violate Bowman's privacy rights. We also reject Bowman's argument that the text messages Dkane sent to Bowman's phone as part of the ruse constituted an

24

*State v. Bowman*, No. 99062-0

unconstitutional trespass.  We reverse the Court of Appeals and reinstate Bowman's

conviction, striking the discretionary supervision fee from Bowman's judgment and

sentence.

_____
Stephens, J.

WE CONCUR:

_____                    _____

_____                    _____
Johnson, J.

_____                    _____
Madsen, J.

_____                    _____
Owens, J.                                                                     Whitener, J.

25

*State v. Bowman*, No. 99062-0
(Yu, J., concurring)

No. 99062-0

YU, J. (concurring) — Today, the court reaffirms "that text message

conversations constitute 'a private affair protected by the state constitution from

warrantless intrusion.'" Majority at 1 (quoting *State v. Hinton*, 179 Wn.2d 862,

865, 319 P.3d 9 (2014)). *Hinton* was a groundbreaking decision in 2014, and it

remains at the forefront of constitutional digital privacy protections today. As cell

phone use and technology continue to evolve, courts will continue to face similar

but distinguishable cases, raising related but distinct issues. When deciding these

cases, we must proceed carefully, guided by the data-driven, state-specific

approach we took in *Hinton*.

As discussed further below, I view this as a close case, but I ultimately agree

with the majority that Reece Bowman's conviction should be reinstated because

Homeland Security Agent Marco Dkane did not violate Bowman's article I,

section 7 right to privacy. Therefore, I respectfully concur. However, I write

separately to emphasize that we are distinguishing this case from *Hinton* on a

1

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

factual basis without disturbing its legal analysis. *Hinton* remains the seminal

Washington case on issues concerning text message privacy, and the result here

should not be misconstrued as a retreat from our strong commitment to *Hinton*'s

protections.

## ANALYSIS

A.    It is essential that Washington courts adhere to the digital privacy principles set forth in *Hinton*

Article I, section 7 of the Washington Constitution "is qualitatively different

from the Fourth Amendment [to the United States Constitution] and provides

greater protections" in many ways. *Hinton*, 179 Wn.2d at 868. Therefore,

"[w]hen presented with arguments under both the state and federal constitutions,

we start with the state constitution." *Id.* Our state constitutional analysis requires

"'an examination of the constitutional text, the historical treatment of the interest

at stake as reflected in relevant case law and statutes, and the current implications

of recognizing or not recognizing an interest.'" *State v. Mayfield*, 192 Wn.2d 871,

879-80, 434 P.3d 58 (2019) (quoting *State v. Chenoweth*, 160 Wn.2d 454, 463, 158

P.3d 595 (2007)).

Article I, section 7 protects "private affairs," meaning "'those privacy

interests which citizens of this state *have held, and should be entitled to hold,* safe

from governmental trespass absent a warrant.'" *Hinton*, 179 Wn.2d at 868

(quoting *State v. Myrick*, 102 Wn.2d 506, 511, 688 P.2d 151 (1984)). This is

2

*State v. Bowman*, No. 99062-0
(Yu, J., concurring)

analytically distinct from and "broader than the Fourth Amendment's reasonable

expectation of privacy inquiry," which provides protection only "if the government

intrudes on a *subjective and reasonable expectation* of privacy." *Id.* (emphasis

added) (citing *Katz v. United States*, 389 U.S. 347, 351-52, 88 S. Ct. 507, 19 L. Ed.

2d 576 (1967)). Thus, when considering the scope of private affairs protected by

article I, section 7, "we necessarily reject" deference to doctrines that are

"fashioned from the explicit language of" the Fourth Amendment and, instead,

must engage in an independent state law analysis. *Myrick*, 102 Wn.2d at 512.

In *Hinton*, our independent approach to privacy rights proved necessary

because when we first "addressed the privacy interests of a sender when police

access a sender's text messages on a recipient's device," few other courts had done

so. 179 Wn.2d at 867. Moreover, the courts that had addressed the issue had

drawn differing conclusions. *Id.* (citing *State v. Patino*, 2012 WL 3886269, No.

P1-10-1155A, slip op. (R.I. Super. Ct. Sept. 4, 2012) (finding sender had

reasonable expectation of privacy), *aff'd in part, vacated in part*, 93 A.3d 40

(2014); *Fetsch v. City of Roseburg*, No. 6:11-cv-6343-TC, 2012 WL 6742665 (D.

Or. Dec. 31, 2012) (court order) (finding the opposite)). In the years since,

additional courts have weighed in, applying both the Fourth Amendment and the

privacy provisions of their respective state constitutions. These courts have

"uniformly," perhaps universally, declined to recognize the digital privacy

3

*State v. Bowman*, No. 99062-0
(Yu, J., concurring)

protections guaranteed by *Hinton*. *Commonwealth v. Delgado-Rivera*, 487 Mass.

551, 563-64, 168 N.E.3d 1083 (2021) (Massachusetts Constitution and the Fourth

Amendment); *see also State v. Mixton*, 250 Ariz. 282, 296-97, 478 P.3d 1227

(2021) (Arizona Constitution), *cert. denied*, No. 20-8321 (U.S. Oct. 4, 2021);

*Patino*, 93 A.3d at 57 (Fourth Amendment; reversing superior court opinion cited

by *Hinton*).

Nevertheless, today we reaffirm *Hinton* and its promise that "technological

advancements do not extinguish privacy interests that Washington citizens are

entitled to hold." 179 Wn.2d at 870. *Hinton* was correct when it was decided, and

it remains correct today. Moreover, in addition to *Hinton*'s analysis of article I,

section 7's text, relevant Washington legal history, and empirical data available in

2014, we also have the benefit of more recent data to support and expand on our

jurisprudence where appropriate.

When we decided *Hinton*, cell phones in general and text messaging in

particular were already "common" and "expected to rise" in use. *Id.* (citing Aaron

Smith, *Americans and Text Messaging*, PEW RES. CTR. at 3 (Sept. 19, 2011),

http://www.pewinternet.org/2011/09/19 /americans-and-text-messaging/). Today,

*97 percent* of people in the United States "own a cellphone of some kind."[1]

---

[1] *Demographics of Mobile Device Ownership and Adoption in the United States,* PEW
RES. CTR. (Apr. 7, 2021), https://www.pewresearch.org/internet/fact-sheet/mobile/
[https://perma.cc/QAB2-D3EY].

4

*State v. Bowman*, No. 99062-0
(Yu, J., concurring)

Moreover, a 2015 survey found that text messaging was both "the most *frequently-used*" and "the most *widely-used* smartphone feature," surpassing even voice and video calls.[2] Thus, in terms of sheer volume, "the nature and extent of information exchanged during a text messaging conversation" may now *exceed* the "details shared during personal phone calls." *Cf. Hinton*, 179 Wn.2d at 870 (noting that the two modes of communication "can involve the same intimate details").

In addition, the subject matter of text messages has become, if anything, more sensitive, and more in need of strict constitutional protections. We observed in 2014 that "[t]ext messages can encompass the same intimate subjects as phone calls, sealed letters, and other traditional forms of communication that have historically been strongly protected under Washington law." *Id.* at 869-70. The truth of this observation was later confirmed by a survey finding that more than half of smart phone owners had "used their phone in the last year to *look up information about a health condition*" and "to do *online banking*." *U.S. Smartphone Use in 2015* at 20. In addition, 40 percent or more had used their phones to find "information about a place to live," "to look up information about a job," and "to look up government services or information," thereby potentially

---

[2] Aaron Smith, *U.S. Smartphone Use in 2015*, PEW RES. CTR. at 33 (Apr. 1, 2015), https://www.pewinternet.org/2015/04/01/us-smartphone-use-in-2015/ [https://perma.cc/T7QU-5YRQ] (*U.S. Smartphone Use in 2015*); *see also Nissen v. Pierce County*, 183 Wn.2d 863, 884, 357 P.3d 45 (2015).

5

*State v. Bowman*, No. 99062-0
(Yu, J., concurring)

"expos[ing] a 'wealth of detail about [their] familial, political, professional, religious, and sexual associations.'" *Id.* (emphasis omitted); *Hinton*, 179 Wn.2d at 869 (quoting *United States v. Jones*, 565 U.S. 400, 415, 132 S. Ct. 945, 181 L. Ed. 2d 911 (2012) (Sotomayor, J., concurring)).

Thus, *Hinton*'s protections remain vital, and the contrary decisions of other jurisdictions cannot cast doubt on our own interpretation of Washington law. Nevertheless, these decisions indicate that Washington courts must be particularly cautious in our approach to constitutional digital privacy issues. In order to maintain our constitutional independence and robust protections, we must guard against deferring to the reasoning of other jurisdictions, and we must "not strain to apply analogies where they do not fit." *Hinton*, 179 Wn.2d at 873.

This can be exceedingly difficult to do when confronting novel issues and factual scenarios because "[t]he legal system has always operated, with reasonable success, by employing analogies." Joan Catherine Bohl, *My iPhone is my Castle: One Aspect of Protecting Privacy in a Digital Age*, 30 J. MARSHALL J. INFO. TECH. & PRIVACY L. 1, 1 (2013). Yet, when we analyze article I, section 7 claims, we have the duty to examine "'the current implications of recognizing or not recognizing an interest.'" *Mayfield*, 192 Wn.2d at 879-81 (quoting *Chenoweth*, 160 Wn.2d at 463). Moreover, because text messaging is "a unique form of communication" and digital technology is constantly evolving, even recent

6

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*State v. Bowman*, No. 99062-0
(Yu, J., concurring)

precedent cannot always capture the full implications of failing to protect digital

privacy rights in any given case. *Hinton,* 179 Wn.2d at 873. Therefore, as in

*Hinton*, we must be cautious when attempting to draw analogies from precedent,

and courts should consider admissible empirical data to the extent that it promotes

just results, which reflect "the realities of modern life." *Id.*

B.      This case is narrowly distinguishable from *Hinton*

I ultimately agree with the majority that Agent Dkane did not violate

Bowman's state constitutional right to privacy because, as the trial court ruled,

"*Hinton* is distinguishable based on the facts." 1 Verbatim Report of Proceedings

(May 2, 2018) (VRP) at 98.

Agent Dkane did not pose as Mike Schabell by using Schabell's phone to

respond to a text message conversation initiated by Bowman, as occurred in

*Hinton*. *See* 179 Wn.2d at 866. Nor did Agent Dkane pose as Schabell by merely

switching to a different phone to resume an ongoing conversation between

Schabell and Bowman, which I believe would be insufficient to distinguish *Hinton*.

Instead, Agent Dkane posed as Schabell to start an entirely new conversation. He

did so using "his own phone and his own phone number to contact Mr. Bowman

who actually questioned the caller, 'Yeah, what Mike is this?'" 1 VRP at 98.

Based on these factual differences, *Hinton* does not directly control the outcome

here, and based on the arguments presented, I do not believe the court has

7

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

sufficient basis to hold that Bowman's right to privacy was violated. However, I

do not believe this is an easy case, and slight variations in the facts or the issues

could lead to an entirely different outcome.

In *Hinton*, we observed that "Hinton reasonably believed he was disclosing

information to his known contact" rather than a stranger. 179 Wn.2d at 876. We

also recognized that "Hinton certainly assumed the risk that [his contact] would

betray him to the police . . . [b]ut that risk should not be automatically transposed

into an assumed risk of intrusion by the government." *Id.* at 874. Thus, we

concluded that Hinton's article I, section 7 rights were violated because (1) Hinton

reasonably believed he was texting with a known contact *and* (2) the police had

violated that person's privacy rights by searching their phone without authority of

law. In this case, the record and arguments presented do not permit us to make the

same determinations. However, the outcome here should not be mistaken for a

rejection of *Hinton*'s analytical approach.

1. We have insufficient information about Bowman's reasonable belief that his text messages were received and read by a known contact

The Court of Appeals was correct to consider whether Bowman

"'reasonably believed' he was texting with a 'known contact'" because *Hinton*

explicitly directs courts to do so. *State v. Bowman*, 14 Wn. App. 2d 562, 568, 472

P.3d 332 (2020) (quoting *Hinton*, 179 Wn.2d at 876). *Contra* majority at 11-12.

*State v. Bowman*, No. 99062-0
(Yu, J., concurring)

Moreover, I agree with the Court of Appeals that "Bowman did not converse with someone he *knew* to be a stranger." *Bowman*, 14 Wn. App. 2d at 568 (emphasis added). Nevertheless, based on the record and arguments presented, it is difficult to say whether Bowman could reasonably believe the messages he sent to Agent Dkane were, in fact, being received and read by Schabell. Such an argument is not foreclosed by our opinion today; it would merely require more information in order to succeed.

Although *Hinton* accurately described and predicted many important developments in cell phone and text message use, it could not possibly consider everything that might be relevant, nor did it purport to do so. Therefore, when considering the potential implications of decisions regarding digital privacy rights, courts may need to follow *Hinton*'s example by considering empirical data regarding relevant subjects that *Hinton* did not reach.

One such subject is how access to and use of cell phones may vary between and within populations. Recent research indicates that "the digital lives of Americans with lower and higher incomes remain markedly different."[3] Where relevant, parties and courts should raise and consider such differences in order to

---

[3] Emily A. Vogels, *Digital Divide Persists Even as Americans with Lower Incomes Make Gains in Tech Adoption*, PEW RES. CTR. (June 22, 2021), https://www.pewresearch.org/fact-tank/2021/06/22/digital-divide-persists-even-as-americans-with-lower-incomes-make-gains-in-tech-adoption/ [https://perma.cc/TTF9-LGK2].

9

*State v. Bowman*, No. 99062-0
(Yu, J., concurring)

ensure that article I, section 7 equally protects the digital privacy of everyone in Washington.

For instance, in this case Agent Dkane, posing as Schabell, sent text messages from a different number on a "burner," meaning a prepaid cell phone.[4] Clerk's Papers (CP) at 45. There are many legitimate reasons a person may use a prepaid cell phone, or otherwise text a known contact from an unknown number, including loss of access to one's primary cell phone (or, as Agent Dkane phrased it when posing as Schabell, "cause my old school phone went to sh*t"). *Id.* This is an important consideration, which must be distinguished from *Hinton*'s observation that "individuals closely associate with and identify themselves by their cell phone numbers," thus minimizing "the possibility that someone else will

---

[4] Although the majority of cell phone users pay for service through a contract, a 2015 survey found that prepaid cell phones are still regularly used for lawful, private communication. Kyley McGeeney, *Appending a Prepaid Phone Flag to the Cell Phone Sample*, 8 SURVEY PRACTICE 1, 2 (2015) ("In the survey, 12.4 percent of numbers in the total cell sample were flagged as prepaid cell phones."), http://www.surveypractice.org/article/2837-appending-a-prepaid-phone-flag-to-the-cell-phone-sample [https://perma.cc/6AR8-YRR4]. Moreover, "the respondents with prepaid flagged cell phone numbers" were "significantly less likely to be white," there were "significantly more Spanish language interviews in the prepaid sample," and the prepaid sample was generally "lower educated, lower income," and more likely to "self-identify as lower class." *Id.* at 3.

Thus, the use of a prepaid phone certainly cannot be permitted to diminish a person's digital privacy rights—for instance, it should not be proof that a person should have been suspicious because the police used a prepaid phone when posing as a known contact. Indeed, it is particularly important to safeguard the digital privacy rights of prepaid cell phone users because they are "more likely to only have a cell phone with no landline" and, therefore, no better option for private communications. *Id.* at 4.

*State v. Bowman*, No. 99062-0
(Yu, J., concurring)

possess an individual's phone." 179 Wn.2d at 871. It was (and still is) accurate to say that each cell phone number is typically associated with only one individual. However, that does not mean that each individual is typically associated with only one cell phone number.

To the contrary, one person may own and regularly use multiple cell phones with different phone numbers.[5] In addition, access to one's primary cell phone may be frequently interrupted "thanks to a combination of financial constraints and technical limitations," making it necessary to use temporary, inexpensive replacements such as prepaid phones. *U.S. Smartphone Use in 2015* at 19.

Such interruptions do not affect all cell phone owners equally. Although a "substantial majority of smartphone owners (80%) describe their phone as 'worth the cost,'" nearly "one-in-five (19%) describe it as a 'financial burden.'" *Id.* at 29. In fact, 23 percent of smartphone users have needed "to cancel or shut off their cell phone service for a period of time because it was too expensive to maintain." *Id.* at 14. These interruptions in service were "especially common among lower-income smartphone owners," in addition to "African Americans and Latinos." *Id.* And among those who "lack any other type of high-speed access at home, and have

---

[5] *See Nissen*, 183 Wn.2d at 877-78 (noting the challenges that arise from "using a private cell phone to conduct public business"); *A Third of Americans Live in a Household with Three or More Smartphones*, PEW RES. CTR. (May 25, 2017), https://www.pewresearch.org/fact-tank/2017/05/25/a-third-of-americans-live-in-a-household-with-three-or-more-smartphones/ [https://perma.cc/9P3T-SLYP].

11

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*State v. Bowman*, No. 99062-0
(Yu, J., concurring)

limited options for going online other than their cell phone," *almost half* of the respondents experienced such interruptions. *Id.* at 17 (emphasis omitted), 19.

The result is that "those Americans who rely most heavily on their smartphones as a gateway to online services and information are often the ones whose connections to their devices are most tenuous." *Id.* at 13. We must work to ensure that these hardships do not carry the additional burden of diminishing the person's digital privacy rights. Thus, in this case, it would be inappropriate to give dispositive weight to the fact that when Agent Dkane posed as Schabell, he did it by texting from a different phone number. Nevertheless, in addition to the prepaid phone and different phone number, this case is also distinguishable from *Hinton* in other ways. Agent Dkane initiated the conversation, not Bowman, and Bowman indicated he did *not* initially believe that the person texting him was Schabell.

There is also, of course, the fact that Schabell consented to the search of his cell phone, a fact not present in *Hinton*. However, like the other factual distinctions listed above, Schabell's consent is not dispositive. Instead, it is relevant, but not conclusive, as to the second point in *Hinton*'s analysis: that although we necessarily assume the risk that our friends will betray us, we do not automatically assume the risk that the government will betray our friends.

12

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*State v. Bowman*, No. 99062-0
(Yu, J., concurring)

     2.      We do not have sufficient information to determine whether Agent Dkane violated Bowman's privacy rights

If we were able to conclude that Bowman reasonably believed that his text messages to Agent Dkane were actually being received and read by Schabell, then *Hinton* directs us to take an additional step before holding that Agent Dkane violated Bowman's privacy rights. In *Hinton*, this additional step was satisfied because by searching Hinton's friend's phone without consent, the police violated the friend's constitutional right to privacy. 179 Wn.2d at 874. Moreover, "Hinton had standing" to raise this violation of his friend's privacy rights because, as we held firmly, the risk our private information will be disclosed "should not be automatically transposed into an assumed risk of intrusion by the government." *Id.* at 869 n.2, 874.

Here, it is certainly true that Agent Dkane did not violate Schabell's privacy rights by searching his phone without consent. The trial court found, and no one disputes, that "Schabell gave consent for law enforcement to search his phone." CP at 94. However, the fact that authorities did not violate Schabell's privacy rights in the *same* way as in *Hinton* does not automatically mean that authorities did not violate Schabell's privacy rights in *some other* relevant way. If there were such a violation, Schabell could raise the issue in his own criminal case, or perhaps in civil litigation. However, it is likely that Bowman would also have standing to

13

*State v. Bowman*, No. 99062-0
(Yu, J., concurring)

raise the issue here.  As in *Hinton*, although Bowman assumed the risk that

Schabell would betray him to the police, he did not assume the risk that the police

would betray Schabell.  *Hinton*, 179 Wn.2d at 869 n.2, 874.

For this reason, I disagree with the majority's attempt to cast this as an

ordinary police investigation, akin to the use of a ruse or an informant.  *See*

majority at 14-15 (citing *Hoffa v. United States*, 385 U.S. 293, 302, 87 S. Ct. 408,

17 L. Ed. 2d 374 (1966); *State v. Goucher*, 124 Wn.2d 778, 781, 786-87, 881 P.2d

210 (1994); *State v. Athan*, 160 Wn.2d 354, 367-68, 158 P.3d 27 (2007)).  *Hinton*

pointed out that such analogies are not appropriate where police pose as known

contacts via text message because "[u]nlike a phone call, where a caller hears the

recipient's voice and has the opportunity to detect deception," a text message does

not provide such safeguards.  179 Wn.2d at 876.  It is true that, as discussed above,

Bowman did have some opportunity to detect deception here, although no single

factor in the analysis is entitled to dispositive weight.  Therefore, it could be

argued that the basis on which *Hinton* rejected the analogy does not apply with the

same force in this case.

However, analogizing to ruses and informants is still inappropriate here for

reasons that were not necessary to discuss in *Hinton*.  In typical police

investigations, the police either assume a fictional identity or enlist a real person to

act as a police informant.  *See* majority at 14-15 (citing *Hoffa*, 385 U.S. 293;

14

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Goucher*, 124 Wn.2d 778; *Athan*, 160 Wn.2d 354). Here, Agent Dkane did neither, choosing instead to assume the identity of a real person, Schabell. In appropriate cases, this could be a highly relevant distinction. Unlike fictitious people, real people have privacy rights protected by article I, section 7. And unlike informants, if police assume a person's identity via text message, that person may never know that it happened.

I do not contend that Bowman "can forever control the information he willingly shares with an associate who might choose to reveal it." *Id.* at 14. And based on the record and briefing presented, I cannot hold that Agent Dkane violated Schabell's privacy rights. However, it appears that Agent Dkane used lawfully obtained information to assume Schabell's identity and conduct affairs in his name without Schabell's knowledge or consent. If that is the case, then I strongly question whether such tactics are consistent with article I, section 7.

As the majority points out, "There is no precedent for requiring further 'consent' for Dkane to use the information he obtained from the lawful search of Schabell's phone to then engage Bowman in a new text message exchange on a law enforcement device" *Id.* at 13. However, I am also not aware of any Washington precedent that permits the government to assume an existing person's identity and conduct affairs in their name based solely on the government's lawful access to some private information about that person. Where there is no precedent

15

State v. Bowman, No. 99062-0
(Yu, J., concurring)

directly on point, as is often true in digital privacy cases, we should not assume

that the lack of precedent corresponds to a lack of protection. Instead, *Hinton*

directs us to engage in an independent analysis that is state-specific, data-driven,

and cognizant of "the realities of modern life." 179 Wn.2d at 873.

A government agent assuming a person's identity and conducting affairs in

their name would almost certainly "disturb[ ]" that person's "private affairs," even

if the agent already knew some private information about them. WASH. CONST. art.

I, § 7. Thus, it seems likely that a person's identity is something "'which citizens

of this state *have held, and should be entitled to hold,* safe from governmental

trespass absent a warrant.'" *Hinton*, 179 Wn.2d at 868 (quoting *Myrick*, 102

Wn.2d at 511). And disturbing a person's private affairs without a warrant,

consent, or any other applicable exception to the warrant requirement (that is,

"without authority of law") is explicitly prohibited by article I, section 7, "'with no

express limitations.'" *Id.* (internal quotation marks omitted) (quoting *State v.*

*Young*, 123 Wn.2d 173, 180, 867 P.2d 593 (1994)).

While it is possible that such authority of law could be obtained with proper

consent or a warrant, I doubt that it is present here. It is clear that Schabell's

consent to Agent Dkane *searching his phone* cannot, in itself, provide sufficient

authority of law for Agent Dkane to *assume Schabell's identity* because "[a]

16

*State v. Bowman*, No. 99062-0
(Yu, J., concurring)

consensual search may go no further than the limits for which the consent was

given." *State v. Reichenbach*, 153 Wn.2d 126, 133, 101 P.2d 80 (2004).

Nevertheless, given the limitations of the facts and issues presented in this

case, we could not hold that Agent Dkane violated Bowman's article I, section 7

rights. However, this issue, and many other related issues, will likely require

further consideration if such investigatory tactics continue to be used in

Washington.

CONCLUSION

With the above observations, I respectfully concur.

_____
Yu, J.

_____
González, C.J.

_____
Gordon McCloud, J.

_____
Montoya-Lewis, J.

17